**UNITED STATES of America, Appellee,**

v.

**Alex O. GAVRILOVIC, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**John R. KUEFFNER, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Scott Edward STANTON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Kenneth SHERMAN, a/k/a Ken Cortells and Ken Reese, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Michael Jeffrey SORENSON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Timothy John OLSON, Appellant.**

Nos. 76–1219, 76–1220, 76–1242, 76–1379, 76–1381 and 76–1382.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 7, 1976.

Decided Feb. 16, 1977.

Lawrence J. Fleming, St. Louis, Mo., Howard Schainker, John J. Allan, Clayton, Mo., Graham W. LaBeaume, St. Louis, Mo., for appellants; Robert A. Hampe, St. Louis, Mo., on brief for appellants, Stanton, Gavrilovic and Kueffner.

Michael W. Reap, Asst. U. S. Atty., St. Louis, Mo., for appellee; Barry A. Short, U. S. Atty., and Michael W. Reap, Asst. U. S. Atty., St. Louis, Mo., on brief.

Vince D'Angelo, Albuquerque, N. M., on brief for appellant, Stanton; John J. Allan, St. Louis, Mo., on brief for appellant, Gavrilovic; Lawrence J. Fleming, Graham W. LaBeaume, St. Louis, Mo., Howard Schainker, Clayton, Mo., on brief for appellants, Sherman, Sorenson and Olson.

Before GIBSON, Chief Judge, and LAY and STEPHENSON, Circuit Judges.

LAY, Circuit Judge.

This is a consolidated appeal [1] by defendants Alex O. Gavrilovic, John R. Kueffner, Scott Edward Stanton, Kenneth Sherman, Michael Jeffrey Sorenson and Timothy

1. The defendants Stanton, Gavrilovic, Kueffner, Sorenson and Olson were prosecuted under a two-count indictment, while Sherman was charged separately in a three-count indictment.

John Olson, who were convicted of manufacturing a controlled substance, mecloqualone, and conspiracy to manufacture and distribute that drug in violation of 21 U.S.C. §§ 841(a)(1) and 846.[2] Defendant Sherman was also convicted of possession of mecloqualone with intent to distribute in violation of § 841(a)(1).

The defendants assert that their convictions should be reversed because their alleged violations of §§ 841(a)(1) and 846 took place prior to the effective date of the regulation placing mecloqualone on Schedule I of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (Drug Abuse Act), 21 U.S.C. § 801 et seq.

We agree. We find that the action of the Administrator of the Drug Enforcement Administration (DEA) with regard to the effective date of the regulation was not in compliance with 5 U.S.C. § 553(d).[3] Since we find the Administrator's action was not justified, we vacate the judgments of conviction.[4]

I

In April of 1975 the defendants prepared to manufacture mecloqualone, a known depressant considered to have no currently accepted medical use, in a warehouse in St. Louis, Missouri. They conducted their operation under a veil of secrecy by organizing and representing themselves as Parade Manufacturing Co., a manufacturer of dyes and decals for T-shirts. The evidence also shows that in April 1975 the defendants

---

The defendants Stanton, Gavrilovic and Kueffner were tried by a jury; the remaining three defendants, Sorenson, Olson and Sherman, waived a jury trial and agreed to consolidate the trial on the two indictments. Following their convictions the defendants filed their respective appeals, which have been consolidated for the purposes of argument and opinion.

2. 21 U.S.C. § 841(a)(1) provides:

   (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

   . . .

   21 U.S.C. § 846 makes it unlawful to conspire to violate § 841(a)(1).

3. Although the Attorney General is authorized by 21 U.S.C. § 811 to add drugs to the schedules of controlled substances, 21 U.S.C. § 871(a) allows him to delegate his responsibilities. In 28 C.F.R. 0.100 the Attorney General delegated to the Administrator of the DEA the responsibility of determining what drugs should be placed on the schedules of controlled substances.

   When placing a drug on the schedules § 811 requires compliance with the rule making procedures of the Administrative Procedure Act, 5 U.S.C. §§ 551–59. Section 553 of the Act requires publication in the Federal Register of proposed rule making; opportunity to be heard; a statement in the rule of its basis and purpose; and publication in the Federal Register of the rule as adopted. Section 553 provides in part:

   . . . . .

   (b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—
   (1) a statement of the time, place, and nature of public rule making proceedings;
   (2) reference to the legal authority under which the rule is proposed; and
   (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

   . . . .

   (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.
   (d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

   . . . . .

   (3) as otherwise provided by the agency for good cause found and published with the rule.

   . . . .

4. Since we find this issue to be dispositive we do not discuss the other issues raised on appeal.

purchased large quantities of the chemicals and equipment needed to manufacture mecloqualone. At the time the defendants commenced their operation it was *not* a violation of § 841(a)(1) to manufacture mecloqualone, since it was not then listed on a schedule of controlled substances. At that time, however, it was necessary to register with the Secretary of Health, Education and Welfare in order to manufacture any drug, not otherwise proscribed under the Drug Abuse Act.[5] Both the government and the defendants acknowledge that the defendants were not registered.

During June 1975 the DEA's St. Louis office began surveillance of the defendants' operations. On June 25, 1975, results of numerous observations prompted Thomas Maher, the agent in charge, to write the Chief Counsel of the DEA requesting that mecloqualone be made a controlled substance as soon as possible in order "to prevent a public health hazard." In support of this request, Maher stated that the defendants were capable of producing large amounts of mecloqualone and "will probably be into production within one week." Prior to receiving the letter the Administrator of the DEA had taken the first step in the administrative process of controlling mecloqualone by publishing on May 29, 1975, in the Federal Register a notice entitled "Proposed Placement of Mecloqualone and the Thiophene Analog of Phencyclidine in Schedule I." 40 Fed.Reg. 23306.

Since the DEA received no comments after publication, a hearing was not necessary. The Administrator then promulgated a regulation adding mecloqualone and the thiophene analog of phencyclidine to Schedule I and published notice of it in the Federal Register on July 8, 1975. 40 Fed.Reg. 28611. He set forth his findings that both drugs had a high potential for abuse, that

neither had a currently accepted medical use, and that there was a lack of accepted safety for use of the drugs even under medical supervision. However, unless he could show "good cause" the Administrator was required to give the public 30 days notice before the regulation became effective. *See* 5 U.S.C. § 553(d).[6] Although the Administrator found the same dangers for both drugs, the effective date for the addition of the thiophene analog of phencyclidine to Schedule I was August 11, 1975, while the effective date for the addition of mecloqualone was July 10, 1975, just two days after publication in the Federal Register.

In order to justify the July 10 effective date the Administrator made the following finding of "good cause":

> *Effective dates.* Based on investigations conducted by the Drug Enforcement Administration, the Acting Administrator hereby finds that mecloqualone, in the past, has been clandestinely manufactured for purposes of distribution and diversion outside legitimate drug channels. A most recent investigation has revealed that this clandestine manufacturing activity continues.

> The Acting Administrator finds that Congress intended that the Attorney General " . . . should not be required to wait until a number of lives have been destroyed or substantial problems have already arisen before designating a drug as subject to controls of the [Act] . . ." H.R.Rep.No.91–1444 (part 1) 91st Cong., 2d Sess. 35 (1970), U.S.Code Cong. & Admin.News 1970, p. 4566.

> Considering the danger inherent in mecloqualone as a drug meeting the criteria for inclusion into Schedule I, and con-

---

5. Under 21 U.S.C. § 360(b) "every person who owns or operates any establishment . . . engaged in the manufacture, preparation, propagation, compounding or processing of a drug" is required to register his name and place of business with the Secretary. Failure to register as required by § 360 is a prohibited act under 21 U.S.C. § 331(p) and is punishable by one year imprisonment or a $1,000 fine. 21

U.S.C. § 333(a). Under 21 U.S.C. § 332 federal district courts are given the jurisdiction to restrain violations of § 331(p).

More stringent registration requirements are imposed on manufacturers of controlled substances by 21 U.S.C. §§ 822, 823 and 824.

6. *See* n.3 *supra.*

sidering that Congress intended that controls apply to drugs in a preventative manner, the Acting Administrator hereby finds, based upon the above, that the public health, as well as safety, necessitate the placement of Schedule I controls upon mecloqualone at a date earlier than thirty days from the date of publication of this order in the Federal Register.

40 Fed.Reg. 28611–12.

On July 31, 1975, the defendants were arrested, and charged with manufacturing a controlled substance and conspiracy from April 1975 to July 31, 1975.[7]

On appeal the defendants do not challenge the placement of mecloqualone on Schedule I, but assert that the Administrator's finding of good cause was arbitrary, since he failed to demonstrate a public necessity for the early effective date.

The government, on the other hand, contends that the Administrator's finding that the continuing manufacturing of mecloqualone, an inherently dangerous drug, constituted an immediate danger to public health and safety, was sufficient to justify the July 10 effective date. The government also contends that the defendants were given adequate notice of the proposed placement of mecloqualone on Schedule I by the May 29, 1975, notice in the Federal Register. Furthermore, the government urges that the clandestine nature of defendants'. operations demonstrated that they had actual knowledge that their activities were illegal.

II

■ It is a fundamental principle of law that "[n]o one can be criminally punished . . . except according to a law prescribed . . . by the sovereign authority before the imputed offense was committed, and which existed as a law at that time." *Kring v. Missouri*, 107 U.S. 221, 235, 2 S.Ct. 443, 455, 27 L.Ed. 506 (1882); and *Bouie v. City of Columbia*, 378 U.S. 347, 353–54, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).

Thus the basic issue, as perceived by this court, is whether the criminal prohibition against the manufacture of mecloqualone was in effect before the defendants' manufacture of the drug.

■ The general rule is that in the absence of an express provision, an act of Congress takes effect on the date of its enactment. *Arnold v. United States*, 13 U.S. (9 Cranch) 103, 119, 3 L.Ed. 671 (1815). *See generally Hassett v. Welch*, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 858 (1938); and *Shwab v. Doyle*, 258 U.S. 529, 42 S.Ct. 391, 66 L.Ed. 747 (1922). Here, however, because the rule making authority has been delegated to the DEA, § 553(d) of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*, requires publication in the Federal Register at least 30 days prior to the rule's effective date unless good cause is shown to forego the full notice period. Thus, if good cause is lacking here, the defendants' conduct which occurred within 23 days of publication would not be unlawful.

In civil cases, the courts have approved an agency finding of good cause when an emergency situation existed. *See Texaco, Inc. v. FEA*, 531 F.2d 1071 (Em.App.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); *Nader v. Sawhill*, 514 F.2d 1064 (Em.App.1975); *Reeves v. Simon*, 507 F.2d 455 (Em.App.1974), *cert. denied*, 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975); *California v. Simon*, 504 F.2d 430 (Em.App.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974); *DeRieux v. Five Smiths, Inc.*, 499 F.2d 1321 (Em.App.), *cert. denied*, 419 U.S. 896, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974). Other courts have held that the 30-day period should be closely guarded and the good cause exception sparingly used. *Texaco, Inc. v. FPC*, 412 F.2d 740 (3d Cir. 1969); and *Kelly v. Department of Interior*, 339 F.Supp. 1095, 1102 (E.D.Cal. 1972). While the courts have restrictively applied the good cause exception, there has not been a detailed analysis of what constitutes good cause under § 553(d).

---

7. The jury was instructed that the defendants' conduct prior to the July 10, 1975 effective date was lawful. In the non-jury trial the court found that the defendants committed unlawful acts after July 10, 1975.

The legislative history [8] of the APA reveals that the purpose for deferring the effectiveness of a rule under § 553(d) was to "afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take other action which the issuance may prompt." S.Rep.No.752, 79th Cong., 1st Sess. 15 (1946); H.R.Rep.No. 1980, 79th Cong., 2d Sess. 25 (1946).[9] The legislative history also indicates the APA was not intended to unduly hamper agencies from making a rule effective immediately or at some time earlier than 30 days. However, proponents of the bill make clear that the good cause exception was not to be an "escape clause which may be arbitrarily exercised but requires legitimate grounds supported in law and fact by the required finding." [10] Legitimate grounds were defined as an "urgency of conditions coupled with demonstrated and unavoidable limitations of time," [11] and that the primary consideration was to be the "convenience or necessity of the people affected." [12]

In keeping with the legislative history the DEA has defined good cause in terms of whether "the conditions of public health or safety *necessitate* an earlier effective date." 21 C.F.R. § 1308.48 (emphasis added).[13]

rule is adopted subsections (d) and (e) provide the public with an opportunity to prepare for the rule and to petition the agency for reconsideration.

The government in urging that the May 29 notice of proposed rule making provided defendants with ample opportunity to object, similarly confuses the defendants' argument concerning the 30-day rule. Defendants do not challenge the placement of mecloqualone (properly defined) on Schedule I. They simply urge that the rule was not legally effective when they manufactured the drug.

The government's reliance on *United States v. Aarons*, 310 F.2d 341 (2d Cir. 1962) is misplaced. In *Aarons* the court held that a failure to give constructive notice of the adoption of a rule by publication in the Federal Register was "without consequence as against a person having actual knowledge." *Id.* at 348; *but cf. Hotch v. United States, supra.* Here the defendants do not claim that the government failed to give them constructive notice, rather they assert a lack of "good cause" for the July 10 effective date. Moreover, the record does not reveal that the defendants had actual knowledge of the placement of mecloqualone on Schedule I.

---

**8.** For a collection of the legislative history of the APA in one source see United States Senate Committee on the Judiciary, *Administrative Procedure Act: Legislative History* (1946).

**9.** The manual prepared by the Attorney General as a guide to federal agencies in adjusting their procedures to the requirements of the APA, explained the legislative purpose of § 553(d):

> The discussion on section 4(c) in the reports of both the Senate and House Committees on the Judiciary makes clear that the phrase "The required publication or service of any substantive rule" does not relate back or refer to the publication of "general notice of proposed rule making" required by section 4(a); rather it is a requirement that substantive rules which must be published in the Federal Register (see section 3(a)(3)) shall be so published at least thirty days prior to their effective date. Similarly, "rules addressed to and served upon named persons", when they are substantive in nature, are subject to section 4(c). The purpose of the time lag required by section 4(c) is to "afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take any other action which the issuance of rules may prompt". Sen.Rep. p. 15; H.R.Rep. p. 25 (Sen.Doc. pp. 201, 259).

*Attorney General's Manual on the Administrative Procedure Act* 36 (1947).

> Several cases have interpreted the 30-day requirement of § 553(d) as an integral aspect of the prepublication dialogue between the public and the agency. *See Hotch v. United States*, 212 F.2d 280, 14 Alaska 594 (9th Cir. 1954); *City of New York v. Diamond*, 379 F.Supp. 503 (S.D.N.Y.1974); and *Kelly v. Department of Interior*, 339 F.Supp. 1095 (E.D.Cal.1972). Notwithstanding the legislative history, these cases seemingly confuse the functions of § 553(b) and (c) with that of § 553(d) and (e). Subsections (b) and (c) provide an opportunity for the public to participate in the rule making *prior* to the agency's adoption of the rule. *After* the

**10.** 92 Cong.Rec. 5650–51 (1946) (remarks of Cong. Walter).

**11.** *Id.*

**12.** *Id.*

**13.** 21 C.F.R. § 1308.48 provides:

> As soon as practicable after the presiding officer has certified the record to the Administrator, the Administrator shall cause to be published in the Federal Register his order in the proceeding, which shall set forth the final rule and the findings of fact and conclusions of law upon which the rule is based. This order shall specify the date on which it shall take effect, which shall not be less than 30

■ We think it clear that Congress intended to impose upon an administrative agency the burden of showing a public necessity for an early effective date and that an agency cannot arbitrarily find good cause. In determining whether the good cause exception is to be invoked, an administrative agency is required to balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable time to prepare for the effective date of its ruling. When the consequence of agency rule making is to make previously lawful conduct unlawful and to impose criminal sanctions, the balance of these competing policies imposes a heavy burden upon the agency to show public necessity.

### III

In reviewing whether the DEA has met its legal burden of showing that the acceleration of the effective date was in fact "necessitated" by the conditions of public health and safety, we do not suggest that this court may substitute its judgment for that of the agency. Our review is only in terms of whether the agency's determination of good cause complies with the congressional intent manifested in § 553(d).

The government concedes that the defendants' operation was a substantial factor in the Administrator's finding of good cause, but at the same time it contends that overall considerations of "public health, as well as safety" necessitated immediate controls. The government relies upon the Administrator's finding that "Congress intended that the Attorney General '. . . should not be required to wait until a number of lives have been destroyed or substantial problems have already arisen before designating a drug as subject to the controls of the [Act] . . .' H.R.Rep.No.91–1444 (part 1), 91st Cong., 2d Sess. 35 (1970)." The House Report discussed the term "potential for abuse" as a key criteri-

on for placement of a drug on the schedules. The quoted language explained the extent that actual abuse needed to be established before a drug could be controlled. However, whether a drug has met the criteria for placement on the schedules of controlled substances is a separate question from whether a public necessity exists for an early effective date. This is not to say that general considerations of public health and safety cannot outweigh the public policy of giving adequate notice. As the degree of risk and the potential for harm increase the need to provide immediate controls increases accordingly. The issue is whether the need is so great and the emergency so defined that it justifies administrative rule making without according the public the ordinary notice required by law.

A review of the record reveals that the Administrator's finding of good cause was not based on an acute and immediate threat to public health and safety posed by general use of the drug, but rather on the specific threat posed by defendants' operation.

Mecloqualone has undergone medical studies since the early 1960s. The DEA knew as early as August 1974 that there was no significant difference between the pharmacological properties of mecloqualone and methaqualone, a Schedule II drug at that time. The Assistant Secretary of Health, Education and Welfare recommended on January 21, 1975, that mecloqualone be placed on Schedule I. Yet, the Administrator did not publish a notice of a proposed rule making until May 29, 1975. Within two weeks of the receipt of Agent Maher's letter describing the defendants' operation, the Administrator promulgated the regulation and published it in the Federal Register.

The record further reveals that mecloqualone and the thiophene analog of phencyclidine posed the same general threat to public health and safety, yet only the placement of mecloqualone on Schedule I was given an early effective date. The obvious

days from the date of publication in the Federal Register unless the Administrator finds that conditions of public health or safety ne-

cessitate an earlier effective date, in which event the Administrator shall specify in the order his findings as to such conditions.

explanation for this differing treatment is Agent Maher's belief that it was necessary to place mecloqualone on Schedule I immediately in order to prevent the defendants' distribution of the drug. The government's admission that the defendants were the only persons who were under surveillance and subsequently arrested for any violation involving mecloqualone within the 30 days after the publication of the rule, makes it clear that Maher's letter defined the alleged emergency.

The conclusion by the Administrator that the defendants' operation "necessitated" immediate control presupposes that the only effective means of preventing the distribution of mecloqualone by the defendants was to place it on Schedule I without further notice. Yet, it must be acknowledged that the defendants' operations could have been enjoined immediately, since the defendants were not registered as a drug manufacturer as required by 21 U.S.C. § 360.[14] The "immediacy" argument for control of defendants' operation loses additional persuasion upon the government's concession that the DEA did not attempt to shut down defendants' operations until 21 days after the effective date.

## IV

We find no public necessity for the advancement of the effective date of the placement of mecloqualone on Schedule I. The record established that the Administrator possessed effective means of closing down the defendants' operation without placing the defendants in jeopardy of a felony conviction under § 841(a)(1). Under the circumstances, we find the justification for the administrative decision to waive the statutory waiting period under § 553(d) inadequate. Although the agency must be given broad leeway in exercising its administrative expertise, we think Congress intended it to carry a heavy burden to justify waiving the 30-day period. This burden is necessarily an exacting one where the exercise of administrative rule making creates harsh criminal sanctions (possession with intent to distribute) where none existed before.

We find the placement of mecloqualone on Schedule I was not effective until 30 days after the July 8 publication in the Federal Register. We conclude that the defendants' conduct occurred prior to the effective date of the placement of mecloqualone on Schedule I and therefore was not in violation of §§ 841(a)(1) and 846.

The judgments of conviction are ordered vacated.

14. Under other provisions of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, the DEA had further control over any distribution of mecloqualone. Section 355 requires approval of an application to "introduce or deliver for introduction into interstate commerce any new drug" as defined by § 321(p). The record reveals that in 1968 a pharmaceutical firm's new drug application for the distribution of mecloqualone as a night-time hypnotic was not approved. Without such approval, any attempt by the defendant to introduce the drug into interstate commerce was subject to immediate restraint under § 332 and the penalties prescribed by §§ 331(d) and 333.