808 F.2d 741
 6 Fed.R.Serv.3d 1248, 17 Envtl. L. Rep. 20,682
 The NORTHERN ARAPAHOE TRIBE, in its own right and on Behalf
of all members of the Northern Arapahoe Tribe,
Plaintiff-Appellant,
v.
Donald P. HODEL, Secretary of the Interior, Kenneth L.
Smith, Assistant Secretary, Indian Affairs, Richard C.
Whitesell, Bureau of Indian Affairs, Billings Area Office
Director, L.W. Collier, Wind River Agency Superintendent,
Defendants-Appellees,
and
The Shoshone Tribe of the Wind River Indian Reservation,
Wyoming, Intervening Defendant-Appellee.
 No. 85-1007.
 United States Court of Appeals,
Tenth Circuit.
 Jan. 9, 1987.
 
 Dale T. White (Thomas W. Fredericks and Robert S. Thompson, III, with him on brief), Fredericks & Pelcyger, Boulder, Colo., for plaintiff-appellant.
 Blake A. Watson (F. Henry Habicht II, Asst. Atty. Gen., Richard A. Stacy, U.S. Atty., Cheyenne, Wyo., Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C., and Robin Friedman, of counsel, Office of Sol., Dept. of Interior, Washington, D.C., with him on brief), Atty., Dept. of Justice, Washington, D.C., for defendants-appellees.
 Kenneth J. Guido, Jr., Washington, D.C., for intervening defendant-appellee.
 Before SEYMOUR and SETH, Circuit Judges, and BROWN, District Judge.*
 SEYMOUR, Circuit Judge.
 
 
 1
 The Northern Arapahoe and Shoshone Tribes jointly inhabit the Wind River Indian Reservation in western Wyoming. At the request of the Shoshone Tribe (the Shoshone), the Secretary of the Interior promulgated regulations establishing a game code regulating hunting on the reservation. The Arapahoe Tribe (the Arapahoe) sued the Secretary and other federal officials, seeking declaratory and injunctive relief to prevent enforcement of the regulations. The Shoshone intervened in the litigation as a defendant. The court held a two-day hearing on the request for a preliminary injunction. It thereafter entered an order denying the Arapahoe request for temporary relief and, at the same time and without prior notice, deciding the case on the merits and denying a permanent injunction.
 
 
 2
 On appeal, the Arapahoe contend that the district court's denial of a permanent injunction should be reversed because the Secretary has no authority to regulate hunting on the reservation and because the Secretary violated the Administrative Procedure Act. Alternatively, they assert that the trial court erred in consolidating the preliminary injunction hearing with a trial on the merits without prior notice, and ask that the case be remanded for trial. We affirm in part, reverse in part, and remand for further proceedings.
 
 I.
 BACKGROUND
 
 3
 The Wind River Indian Reservation was established in 1868 pursuant to the Treaty of Fort Bridger, which set aside territory "for the absolute and undisturbed use and occupation of the Shoshonee Indians ..., and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them." Treaty between the United States of America and the Eastern Band of Shoshonees and the Bannack Tribe of Indians, July 3, 1868, 15 Stat. 673, 674 (the Treaty). Ten years after signing the Treaty, the United States broke this covenant when it brought a band of Northern Arapahoe onto the reservation under military escort. The Arapahoe had been allies of the Sioux, who were antagonistic toward the Shoshone. Despite the Shoshone's continual and vigorous efforts to have the Arapahoe removed, the United States failed to respond, dealing instead with the two tribes as lawful occupants and equals. See generally Shoshone Tribe of Indians v. United States, 299 U.S. 476, 484-98, 57 S.Ct. 244, 246-52, 81 L.Ed. 360 (1937). The Shoshone ultimately were compensated for the taking of part of the reservation in an amount equal to one-half the value of the land, including the timber and mineral resources. See United States v. Shoshone Tribe of Indians, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213 (1938).
 
 
 4
 Today, both tribes inhabit the reservation. According to the superintendent of the Wind River Indian Agency, the combined adult population of the tribes is approximately 5,900. Each tribe governs itself separately by vote of the tribal membership at general council meetings or by vote of its elected business council. A joint business council of representatives from both tribes deals with certain matters of common interest.
 
 
 5
 The reservation itself encompasses nearly 1.9 million acres and ranges in altitude from 4,200 to over 13,000 feet. This topographical diversity provides habitat for a variety of wildlife, from waterfowl to big and small game. Only enrolled members of the tribes may hunt on the reservation. For the Shoshone and the Arapahoe, hunting is a traditional activity and a source of food.
 
 
 6
 Over the years, the tribes have submitted the issue of tribal game codes to their general memberships for decision. They have managed reservation wildlife both jointly and separately. In 1948 they enacted a joint game code, but abolished it five years later. Since that time, the only joint regulations have been prohibitions against waste, spotlighting, and the selling or trading of game meat.
 
 
 7
 In 1977 the tribes expressed concern for game management and called for a study of reservation wildlife. The joint business council passed Resolution No. 3923, which provided:
 
 
 8
 "WHEREAS: The Joint Shoshone and Arapahoe Business Council is aware of the potential of the wildlife habitat available and increasing game herds on the Wind River Indian Reservation, and
 
 
 9
 WHEREAS: A sound wildlife program is based on high-quality habitat and proper management of wildlife species, and
 
 
 10
 WHEREAS: Lack of management and protection of wildlife in the past and unrestricted harvest of wildlife species have occurred,
 
 
 11
 NOW, THEREFORE BE IT RESOLVED, that the US Fish and Wildlife Service be requested to establish a wildlife biologist position in Lander to assist in collecting data to protect habitat and wildlife, and to manage and insure the optimum potential of wildlife species on the Wind River Indian Reservation now, and for the future."
 
 
 12
 Rec., vol. I, at 94. Pursuant to the joint resolution, the United States Fish and Wildlife Service (FWS) undertook a series of habitat and species studies. FWS reported its findings in various separate reports from 1980 to 1982 and in a comprehensive report in 1982 entitled "A Plan for the Management of Wildlife on the Wind River Reservation" (the 1982 Report).[1] The 1982 Report concluded that the tribes' concern about dwindling herds was justified, and recommended management of all wildlife, particularly big game.[2] In December 1983 and February 1984 FWS conducted aerial big game surveys. Richard Baldes, project leader at the Lander FWS office, testified about the results of these surveys: "[T]he information that we collected is the same. The herds are still going down, and we have serious problems. It hasn't changed. It just strengthened what we were saying before." Rec., vol. III, at 9.
 
 
 13
 The tribes disagreed on the proper course of action in light of the conclusions of the FWS studies. In 1980, two years before the publication of the comprehensive 1982 Report, the Shoshone enacted a game code to govern the tribe's own members, which the Arapahoe General Council subsequently rejected as too restrictive. The Shoshone asked the Secretary to impose a moratorium on all hunting on the reservation until the two tribes could agree on a game code. The Associate Solicitor of Indian Affairs declined to intervene, opting instead to encourage the tribes to resolve the matter. In June 1983 the Arapahoe membership again considered enactment of a game code, but voted to table the issue.
 
 
 14
 At various times during the spring and fall of 1983, officials from the Bureau of Indian Affairs (BIA) met with the tribes both jointly and separately and expressed their concern about the need for a game code. The biggest meeting was held in September in Billings, attended by representatives from both tribes, their attorneys, and BIA officials from Washington and the regional office. At that meeting, BIA officials discussed the possibility that the federal government would have to issue regulations in order to fulfill its trust responsibility. The Arapahoe tribal council asked for more time, indicating that it would try to establish a code by January 1984.
 
 
 15
 The hard winter of 1983-1984 forced many of the big game herds to seek shelter and forage in the lower elevations of the reservation. This movement made big game vulnerable to hunters, particularly those with snowmobiles and four-wheel drive vehicles. Reports of a "massive elk kill" in December 1983 prompted wide publicity and a plea from the chairmen of the Shoshone and Arapahoe business councils for tribal members to exercise restraint in the hunting of big game.[3]
 
 
 16
 The Arapahoe failed to enact a game code by January 1984, its proferred target date. Meetings among the tribes and BIA officials continued through the spring. The Arapahoe membership voted in May not to enact a game code. After meeting further with both tribes in July, BIA officials informed them it would accede to the Shoshone request to impose federal regulations.
 
 
 17
 On October 5 the BIA published an interim rule entitled "Wind River Reservation Game Code," which is the subject of this lawsuit. See 49 Fed.Reg. 39,308 (1984) (codified at 25 C.F.R. pt. 244 (1986)). The game code was designed to establish "a controlled wildlife hunting program on the Wind River Reservation in order to conserve, protect and increase the existing wildlife in the reservation area." 49 Fed.Reg. at 39,308. The code became effective upon publication pursuant to the "good cause" exception to the notice and comment provisions of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 553 (1982). The Federal Register notice alluded to the Arapahoe's failure to approve a game code and the Shoshone's request for regulation. The notice stated that immediate intervention was necessary:
 
 
 18
 "The Department finds that there is an immediate need to protect reservation wildlife resources. The hunting season on the Reservation has already begun, and the studies conducted by the U.S. Fish and Wildlife Service indicated that in the absence of a Game Code wildlife could be reduced to a point where normal propagation and recovery will not occur. The Department thus finds that notice and comment procedures prior to making the rule effective are impracticable, unnecessary, and contrary to the public interest under 5 U.S.C. 553(b)(B)."
 
 
 19
 49 Fed.Reg. at 39,309 (emphasis added). The interim code stated that it would be replaced by permanent regulations made with proper notice and comment procedures. See id. By its terms, the game code will remain in effect only until the tribes jointly enact a game code. See 25 C.F.R. Secs. 244.1(a).
 
 
 20
 The game code provides that in 1984 the Wind River Agency Superintendent, an employee of the BIA, would establish the hunting seasons, define the hunting areas, set permit fees, and establish season limits for all wildlife. In subsequent years, the superintendent is to make those determinations before each June 1 after consulting with the tribes. See id. Sec. 244.3(b). In 1984, all enrolled members who wished to hunt were required to purchase a permit at a cost of $5.00, as well as big game tags at $1.00 per species. The only big game that could legally be harvested were elk, antlered deer, and buck antelope, and those only during specific hunting seasons. Hunting of bighorn sheep, moose, black bear, and mountain lion was prohibited. Other rules were established for hunting or trapping furbearing animals, upland game, and waterfowl. Substantial civil and criminal penalties and forfeitures may be imposed for violations of the regulations. 25 C.F.R. Secs. 244.10, 244.18. After the game code was implemented, the Wind River Agency Superintendent obtained equipment and employed five federal enforcement agents.
 
 
 21
 On October 23, 1984, shortly after the regulations were imposed, the Arapahoe filed this action for declaratory and injunctive relief and moved for a temporary restraining order (TRO) to prevent enforcement of the game code. The Shoshone moved to intervene and opposed the issuance of temporary or preliminary relief. On October 24 and 25 the district court held hearings on the motion for a TRO. The Arapahoe filed fifty identical affidavits from members of the tribe, each averring that the affiant had hunted regularly on the reservation for a number of years, that he planned to hunt during the fall, that he hunted only for food, and that enforcement of the regulations would leave him and his family without an adequate food supply.[4] The Arapahoe relied entirely on these affidavits at the hearing, presenting no other evidence.
 
 
 22
 The Government offered the testimony of two witnesses. Richard Baldes of FWS stated his opinion that the regulation was necessary to protect the reservation's game resources. He testified that, if hunting continued at its present rate, moose and bighorn sheep might become extinct or endangered on the reservation. He further stated that, while prong horn antelope and mule deer were in danger of being eliminated from the reservation if hunting continued at past rates, elimination probably would not occur for several years. Baldes also stated that management of furbearing animals was neither necessary nor a concern of the tribes. Lavern William Collier, Wind River Agency superintendent, testified that since implementation of the code, 103 permits had been sold, no violations had been found, and hunting had been somewhat light. In response to the allegations by Arapahoe tribal members that the regulation would leave them without sufficient food, Collier testified that each enrolled Arapahoe member received a $235 monthly allotment derived from the reservation's assets and that various food and assistance programs were available to needy families.
 
 
 23
 On October 30 the district court denied the Arapahoe motion for a TRO, finding that the miniscule cost of compliance with the regulation neither constituted irreparable harm nor outweighed the harm that unrestricted hunting might cause the Shoshone. The court further found that success on the merits was unlikely because the Secretary had authority to promulgate the regulations pursuant to both the Shoshone's treaty rights and the trust responsibility. Additionally, the court held that the interim regulations came within the "good cause" exception of 5 U.S.C. Sec. 553(d)(3) and was not arbitrary and capricious. The court also denied the Arapahoe request for a permanent injunction and declaratory relief.
 
 
 24
 On appeal, the Arapahoe contend that (1) the Secretary lacks authority to regulate on-reservation hunting by Indians; (2) the Secretary violated the notice and comment provisions of the Administrative Procedure Act by implementing the regulations immediately; and (3) the regulations are arbitrary and capricious. Alternatively, the Arapahoe assert that if we do not find in their favor on their legal arguments, we should at least reverse entry of the permanent injunction and remand for further proceedings on the merits because the district court erred in sua sponte consolidating the hearing on preliminary injunctive relief with a trial on the merits without prior notice to the parties.
 
 II.
 
 25
 REGULATION OF HUNTING ON THE WIND RIVER RESERVATION
 
 
 26
 In denying the Arapahoe's claims for relief, the district court ruled that the Secretary possessed authority to enact the game code:
 
 
 27
 "The Court finds that the DOI/BIA does have proper authority to promulgate the regulations composing the 'Wind River Game Code,' 25 C.F.R. Part 244.
 
 
 28
 This action was taken at the behest of the Shoshone Tribe, and the United States as a party to the Fort Bridger Treaty of 1868 and as trustee of the reservation lands has a duty to protect the interests of the inhabitants of the Wind River Reservation. Certainly, neither tribe should be allowed to hunt the wildlife on the reservation to a point of endangerment or extinction. See Washington Game Dept. v. Puyallup Tribe, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973); Washington, et al. v. Washington State Commercial Passenger Fishing Vessel Assoc., et al., 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979)."
 
 
 29
 Rec., vol. I, at 171.
 
 
 30
 The Arapahoe contend that the Secretary lacks any authority to regulate on-reservation hunting by Indians and that, even if he has such authority in exigent circumstances, the factfinding below was inadequate to determine that the wildlife on the reservation have been hunted "to a point of endangerment or extinction." See id. The Secretary and the Shoshone maintain that, in the absence of a jointly-adopted tribal game code, the Secretary has authority to regulate hunting on the reservation pursuant to his responsibility as trustee in accordance with the Treaty and his general authority under 25 U.S.C. Secs. 2 and 9 (1982).
 
 
 31
 A. The Rights of Both Tribes to Hunt and Fish
 
 
 32
 As an initial matter, the Shoshone claim that they possess exclusive treaty rights to hunt and fish on the reservation and that the Arapahoe have no such special rights. Although the Treaty does not expressly mention hunting or fishing rights, these rights were included by implication in the setting aside of the reservation for the Shoshone's "absolute and undisturbed use and occupation," Treaty of July 3, 1868, 15 Stat. 673, 674. See Menominee Tribe of Indians v. United States, 391 U.S. 404, 405-06, 88 S.Ct. 1705, 1707, 20 L.Ed.2d 697 (1968) (rights to hunt and fish implied from treaty clause giving lands to Indians "to be held as Indian lands are held"). The Shoshone contend that their treaty rights to hunt and fish were neither lost nor diminished by the congressional and executive acts recognizing the settlement of the Arapahoe on the reservation, and that the Arapahoe cannot claim treaty rights to hunt and fish by virtue of their coexistence on the reservation. See Wahkiakum Band of Chinook Indians v. Bateman, 655 F.2d 176, 178-80 (9th Cir.1981). The Shoshone further submit that, although they were compensated for the Arapahoe presence on the reservation in an amount equal to one-half the value of the land including timber and mineral resources, see Shoshone Tribe, 304 U.S. 111, 58 S.Ct. 794, 82 L.Ed. 1213, they were never compensated for the loss of their exclusive treaty rights to hunt and fish.
 
 
 33
 We are not persuaded. The very principles of Indian law which dictate that the Shoshone have hunting and fishing rights notwithstanding the lack of an express treaty provision dictate that the Arapahoe have equivalent rights. The Arapahoe have rights to the reservation derived from their status as occupants of the land confirmed by congressional and executive acts. See Shoshone Tribe, 299 U.S. at 486-90, 57 S.Ct. at 246-48 (describing Arapahoe status). The rights to hunt and fish are part of the tribes' larger rights of possession. See United States v. Winans, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905) ("The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians, ... which were not much less necessary to the existence of the Indians than the atmosphere they breathed."); see also Menominee Tribe, 391 U.S. at 406 & n. 2, 88 S.Ct. at 1707 & n. 2; Menominee Tribe of Indians v. United States, 179 Ct.Cl. 496, 388 F.2d 998 (1967), aff'd, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); Felix S. Cohen's Handbook of Federal Indian Law 441-42 (R. Strickland ed. 1982). Whether by treaty or by congressional and executive acts, the Shoshone and the Arapahoe have equal rights to hunt on the reservation. See Cohen's Handbook, supra, at 449; see also Arizona v. California, 373 U.S. 546, 598, 83 S.Ct. 1468, 1496, 10 L.Ed.2d 542 (1963) (establishment of a reservation reserves water rights to Indians, whether the reservation was established by treaty or by executive order).
 
 B. Authority of the Secretary
 
 34
 Actions of the Secretary and those under his authority are subject to judicial review under principles of administrative law. E.g., Tooahnippah v. Hickel, 397 U.S. 598, 90 S.Ct. 1316, 25 L.Ed.2d 600 (1970). Furthermore, in Indian matters, as in other areas, federal executive officials are limited to the authority conferred on them by Congress. See generally Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). "The rulemaking power granted to an administrative agency ... is not the power to make law. Rather, it is 'the power to adopt regulations to carry into effect the will of Congress....' " Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 213-14, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976)). We thus must determine if the Secretary has been granted authority sufficient to support his enactment of the regulations.
 
 
 35
 The district court found that "[h]istorically, the Shoshone and Northern Arapahoe Tribes now occupying the Wind River Reservation have been free to self-regulate the hunting activities of tribal members on the reservation." Rec., vol. I, at 165. The Government does not dispute that the primary authority to regulate hunting lies with the tribes, consistent with their sovereignty over the reservation land and resources. See United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978) ("until Congress acts, the tribes retain their existing sovereign powers"); see also Donovan v. Navajo Forest Products Industries, 692 F.2d 709, 712 (10th Cir.1982). The narrower question presented in this appeal is whether authority exists for the Secretary, at the request of one of the tribes, to adopt interim hunting regulations as a necessary conservation measure to protect endangered wildlife and game on the reservation.
 
 
 36
 1. 25 U.S.C. Secs. 2 and 9.
 
 
 37
 Congress has delegated to the Secretary broad authority to manage Indian affairs, see 25 U.S.C. Sec. 2, and to promulgate regulations relating to Indian affairs, see id. Sec. 9. Sections 2 and 9, however, do not vest the Secretary with general regulatory authority. See Organized Village of Kake v. Egan, 369 U.S. 60, 63, 82 S.Ct. 562, 564, 7 L.Ed.2d 573 (1962). Section 2 delegates the general management of Indian affairs and relations to the Secretary of the Interior and Commissioner of Indian Affairs. The language of section 9 vests authority "for carrying into effect the various provisions of any act relating to Indian affairs." 25 U.S.C. Sec. 9. Given the language of the statute and the fact that hunting on the reservation has historically been a matter of tribal self-regulation, we are reluctant to hold that sections 2 and 9 by themselves could support the regulations. See Organized Village of Kake, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (sections 2 and 9 insufficient to support regulations permitting Indians to operate fish traps contrary to state law); Santa Rosa Band of Indians v. Kings County, 532 F.2d 655, 665 (9th Cir.1975) (sections 2 and 9 insufficient to support regulation granting Secretary authority over applicability of state land use laws on Indian land), cert. denied, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977); cf. Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 691, 99 S.Ct. 3055, 3077, 61 L.Ed.2d 823 (1979) (sections 2 and 9 provide authority to regulate off-reservation fishing to implement treaty right and to preempt state regulation); United States v. Michigan, 623 F.2d 448, 450 (6th Cir.1980) (same), modified on other grounds, 653 F.2d 277, cert. denied, 454 U.S. 1124, 102 S.Ct. 971, 71 L.Ed.2d 110 (1981). For the reasons set out below, however, we conclude that Sections 2 and 9 together with the Treaty, construed in accordance with the special relationship between the United States and Indian tribes, provide the necessary authority for the Secretary to enact these regulations.[5]
 
 
 38
 2. The Relationship Between the Federal Government and Indian Tribes
 
 
 39
 The United States has a unique relationship with Indian tribes "derived from [their] separate constitutional status," Cohen's Handbook, supra, at 219, and their existence as quasi-sovereign governments, see Merrion v. Jicarilla Apache Tribe, 617 F.2d 537, 541 (10th Cir.1980), aff'd, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). Drawing upon the concept of a protectorate or alliance relationship founded upon agreement by treaty, Chief Justice John Marshall described Indian tribes as "domestic dependent nations" which "look to our government for protection." Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17 (1831); see Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 551-52 (1832). The Supreme Court has recognized "the undisputed existence of a general trust relationship between the United States and the Indian people." United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). "This principle has long dominated the Government's dealings with Indians." Id.
 
 3. The Treaty and the Trust Responsibility
 
 40
 The Treaty of 1868 was intended to preserve for the Shoshone a reservation land base with sufficient resources to supply the needs of the Indian people who settled thereon. In the Treaty, the Government undertook the responsibility to protect the persons and property of the Shoshone from wrongdoers "among the whites, or among other people subject to the authority of the United States." Treaty of July 3, 1868, 15 Stat. 673. The right to hunt on the reservation is held in common by both tribes, and one tribe cannot claim that right to a point of endangering the resource in derogation of the other tribe's rights. Under the Treaty, the Government has the right upon request of the Shoshone to protect the resources guaranteed the Shoshone by treaty from misappropriation by third parties. The Government's right extends to preventing overuse by the Arapahoe of their shared right when that overuse endangers the resource and threatens to divest the Shoshone of their right. Because the right to the resource is shared, however, federal regulation of hunting on the reservation must accommodate the rights of both tribes.
 
 
 41
 When viewed in light of the trust responsibility and the Shoshone's specific request for regulation, the Treaty along with 25 U.S.C. Secs. 2 and 9 support the Secretary's authority to establish an interim game code on the reservation when there exists a risk of extinction or endangerment of the wildlife. If the facts support such a risk, the Secretary may implement reasonable interim measures so long as the tribes fail to enact their own game code.
 
 III.
 NOTICE AND COMMENT PROCEDURES
 
 42
 The Arapahoe contend that the district court erred in holding that the Secretary had good cause to forgo the prepublication notice and comment procedures and delayed effective date requirements of the APA. See 5 U.S.C. Sec. 553.
 
 
 43
 Under section 553(b)(B), the agency may dispense with notice of proposed rulemaking "when the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." A second "good cause" exception, in section 553(d)(3), concerns rules actually adopted by an agency rather than proposed rules. See Rowell v. Andrus, 631 F.2d 699, 702-03 (10th Cir.1980). Under this provision, "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except ... as otherwise provided by the agency for good cause found and published with the rule." 5 U.S.C. Sec. 553(d)(3).
 
 
 44
 In making the regulations effective immediately, the Secretary invoked both "good cause" exceptions of section 553. The district court found that the Secretary had "shown good cause for immediate effectiveness in that the onset of this year's hunting season without regulation could reduce population levels of wildlife to a point below that necessary for normal propagation."[6] Rec., vol. I, at 172.A. Section 553(b)(B)
 
 
 45
 The Secretary bears the burden of demonstrating good cause under section 553(b)(B). The exception is "essentially an emergency procedure." Buschmann v. Schweiker, 676 F.2d 352, 357 (9th Cir.1982) (social security regulations). The legislative history further defines the grounds for an agency to find good cause:
 
 
 46
 " 'Impracticable ' means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings. 'Unnecessary ' means unnecessary so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved. 'Public interest ' supplements the terms 'impracticable' or 'unnecessary;' it requires that public rule-making procedures shall not prevent an agency from operating, and that, on the other hand, lack of public interest in rule making warrants an agency to dispense with public procedure."
 
 
 47
 S.Rep. No. 752, 79th Cong., 1st Sess. 14 (1945) (emphasis added). The exception should be narrowly construed because "[i]t is an important safety valve to be used where delay would do real harm. It should not be used, however, to circumvent the notice and comment requirements whenever an agency finds it inconvenient to follow them." United States Steel Corp. v. EPA, 595 F.2d 207, 214 (emphasis added) (footnote omitted), clarified on other grounds, 598 F.2d 915 (5th Cir.1979). Section 553 is designed to give affected parties an opportunity to participate in agency decisionmaking early in the process, when the agency is more likely to consider alternative ideas. United States Steel, 595 F.2d at 214; accord New Jersey v. EPA, 626 F.2d 1038, 1049 (D.C.Cir.1980).
 
 
 48
 The Secretary invoked the good cause exception of section 553(b)(B) because the hunting season on the reservation had already begun and because the FWS studies "indicated that in the absence of a Game Code wildlife could be reduced to a point where normal propagation and recovery will not occur." 49 Fed.Reg. at 39,309. The FWS studies and the testimony before the district court indicate dwindling herds and the possibility that certain species would become endangered or extinct. If the herds were reduced to such a low level that transplants became necessary, the expenditure of funds would be required. See rec., vol. III, at 53-54 (testimony of Richard Baldes). There was evidence that in the previous winter a large number of elk had been killed in one or two months. Thus, the thirty-day delay for notice and comment could produce real harm, see United States Steel, 595 F.2d at 214, and could interfere with the Secretary's fulfillment of the trust responsibility to protect reservation resources, see S.Rep. No. 752, 79th Cong., 1st Sess. 14; cf. supra Part IIB2. Moreover, the Arapahoe had participated in several meetings with BIA officials and the Shoshone about a game code and were well aware that federal regulation was impending. Under these circumstances, the district court did not err in finding that the Secretary had demonstrated that notice and comment were impracticable, unnecessary, and contrary to the public interest under section 553(b)(B). Compare Washington State Farm Bureau v. Marshall, 625 F.2d 296, 306-07 (9th Cir.1980) (good cause under Sec. 553(b)(B) where immediate need to protect children from potentially harmful spray); Reeves v. Simon, 507 F.2d 455, 458-59 (Temp.Emer.Ct.App.1974) (same where gasoline shortages and discriminatory practices deprived some users of supply and led to violence), cert. denied, 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975) with United States Steel, 595 F.2d at 213 (statutory deadlines inadequate to furnish good cause under section 553(b)(B)). See generally K. Davis, Administrative Law Treatise Sec. 6:29 (1982 Supp.).
 
 B. Section 553(d)(3)
 
 49
 We next address whether the Secretary also met his burden of establishing good cause under section 553(d)(3). See Western Oil & Gas Association v. EPA, 633 F.2d 803, 811-12 (9th Cir.1980); see also Rowell, 631 F.2d at 702-03 (similar construction of section 553). The legislative history of section 553(d) indicates that the primary purpose for deferring the effectiveness of a rule was not to encourage prepublication dialogue but rather
 
 
 50
 "to 'afford persons affected a reasonable time to prepare for the effective date of a rule or rules or to take other action which the issuance may prompt.' S.Rep. No. 752, 79th Cong., 1st Sess. 15 (1946); H.R.Rep. No. 1980, 79th Cong., 2d Sess. 25 (1946). The legislative history also indicates the APA was not intended to unduly hamper agencies from making a rule effective immediately or at some time earlier than 30 days. However, proponents of the bill make clear that the good cause exception was not to be an 'escape clause which may be arbitrarily exercised but requires legitimate grounds supported in law and fact by the required finding.' Legitimate grounds were defined as an 'urgency of conditions coupled with demonstrated and unavoidable limitations of time,' and that the primary consideration was to be the 'convenience or necessity of the people affected.' "
 
 
 51
 United States v. Gavrilovic, 551 F.2d 1099, 1104 (8th Cir.1977) (footnotes omitted); see also Nance v. EPA, 645 F.2d 701, 708-09 (9th Cir.), cert. denied, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). In determining whether to invoke the exception, the agency is "required to balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable time to prepare for the effective date of its ruling." Gavrilovic, 551 F.2d at 1105.
 
 
 52
 In finding good cause under section 553(d)(3) to make the game code effective immediately, the Secretary recounted the various refusals by the Arapahoe to agree on a game code, stated that the regulations were being issued on an "emergency basis" in order to permit some hunting during the upcoming season, and again emphasized the immediate need to protect the wildlife and ensure propagation. See 49 Fed.Reg. at 39,309. As we have explained, there were sufficient indicia of urgency to warrant the imposition of the regulations on an interim, emergency basis. Moreover, as the district court found in denying the Arapahoe's request for a TRO, the minimal cost to the Arapahoe of compliance with the regulations did not outweigh the harm that unrestricted hunting might cause the Shoshone. In prescribed seasons during the two months following enactment of the game code, an eligible hunter could harvest one each of the following big game species: elk, antlered deer, and buck antelope. Other species could be legally harvested for minimal fees during prescribed seasons and in accordance with certain bag limits. The district court also found that each enrolled member of the tribes received a $235 monthly allotment and that various food and assistance programs were available to needy families. Under these circumstances, the Secretary's reliance on the good cause exception of section 553(d)(3) was proper. See Nance, 645 F.2d at 709.
 
 IV.
 
 53
 CONSOLIDATION OF TRO HEARING WITH TRIAL ON MERITS
 
 
 54
 Because we do not agree with the Arapahoe's contention that we should reverse the denial of a permanent injunction on the ground that the Secretary acted outside of his authority, we address the argument that the district court nevertheless committed reversible error when it sua sponte consolidated the hearing on the TRO with a trial on the merits without notice to the parties. The Federal Rules of Civil Procedure expressly authorize consolidation:
 
 
 55
 "Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application."Fed.R.Civ.P. 65(a)(2).[7] Before a consolidation order may issue, however, we have required that the parties receive adequate notice so that they may have a full opportunity to present their evidence. See Holly Sugar Corp. v. Goshen County Cooperative Beet Growers Association, 725 F.2d 564, 568 (10th Cir.1984); Penn v. San Juan Hospital, Inc., 528 F.2d 1181, 1187 (10th Cir.1975).
 
 
 56
 Significantly different procedures accompany preliminary and permanent injunctions. Preliminary relief is designed merely to preserve the status quo pending trial on the merits and is often pursued with unavoidable haste. Such relief is customarily granted with procedures less formal and evidence less complete than in a trial on the merits. A party is not required to prove his whole case at a TRO or preliminary injunction hearing. Thornburgh v. American College of Obstetricians & Gynecologists, --- U.S. ----, 106 S.Ct. 2169, 2176, 90 L.Ed.2d 779 (1986); University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). The injunction standard of probable success on the merits is not equivalent to actual success on the merits. Camenisch, 451 U.S. at 394, 101 S.Ct. at 1833. In light of these considerations, it is generally inappropriate for a federal court to render a final judgment on the merits at the preliminary injunction stage when the court has not given the parties clear and unambiguous notice of its intent to consolidate, either before the hearing begins or at a time that will still afford them a full opportunity to present their cases. See id. at 395, 101 S.Ct. at 1834; Penn, 528 F.2d at 1187; see generally DeLeon v. Susquehanna Community School District, 747 F.2d 149, 154-56 (3d Cir.1984) (Sarokin, D.J., concurring).
 
 
 57
 In this case, the district court ordered consolidation the same day it denied the Arapahoe's claims for relief. Less than a month had elapsed since the game code was enacted. No discovery had been conducted, and the Secretary had yet to file a pleading. The court gave no notice whatsoever to the parties of its intent to consolidate, never even indicating at the hearing that it might consider consolidation. Unwarned, the Arapahoe had no opportunity to present additional evidence or to request a continuance. See Holly Sugar, 725 F.2d at 568. Under these circumstances, the consolidation order constituted prejudicial error and an abuse of discretion. See Holly Sugar, 725 F.2d at 568; Penn, 528 F.2d at 1187.
 
 
 58
 We thus agree with the Arapahoe's contention that the factfinding procedure below was inadequate to support the district court's implicit finding that reservation wildlife are sufficiently endangered to warrant the denial of permanent injunctive relief. The Arapahoe wish to challenge the 1982 Report and the conclusions to be drawn from it, the proper course of action in light of those conclusions, the scope of the regulations, and the reality of the alleged elk kill. They are entitled to have their day in court on these issues.
 
 V.
 ARBITRARINESS OF GAME CODE
 
 59
 Finally, the Arapahoe contend that the game code is arbitrary and capricious because the record fails to support the Secretary's conclusion that game are in need of management, because the regulation is overbroad, and because the evidence does not support the severity of the penalties. These arguments are basically factbound, and the Arapahoe will have a full opportunity to present evidence on these issues on remand.
 
 VI.
 CONCLUSION
 
 60
 The judgment of the district court is affirmed insofar as it denied temporary relief and held that the Secretary has legal authority to regulate hunting on the reservation. The judgment is reversed to the extent that it denied a permanent injunction without holding a proper hearing on the factual issues. The cause is remanded for trial on the merits.
 
 
 
 *
 Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation
 
 
 [1]
 Neither the separate studies nor the 1982 Report was filed in the district court or offered in evidence at the hearing, and thus they are not part of the record on appeal
 
 
 [2]
 The regulations promulgated by the Secretary define big game as "any one of the following species of animals: elk, mule deer, whitetail deer, bighorn sheep, moose, antelope, black and grizzly bear, and mountain lion." 25 C.F.R. Sec. 244.2 (1986)
 
 
 [3]
 The press release from the chairmen stated:
 "CHAIRMEN OF THE SHOSHONE & ARAPAHOE TRIBES ASK TRIBAL MEMBERS FOR RESTRAINT IN HUNTING BIG GAME HERDS.
 Because of the severity of this winter's snowstorms, the big game herds on the reservation are suffering hardships that normally don't occur until February and March. The lack of food in traditional wintering grounds has driven our big game herds down to the lower elevations where they are easy prey for hunters with their four-wheel drive vehicles and high-powered rifles. Some Shoshone and Arapahoe Tribal members even go so far as to use snow machines to slaughter big game.
 In just the past two days, elk and deer have been killed, by the dozens, by some reservation hunters and more will die if some tribal members continue to kill elk and deer in large quantities.
 While we realize that in today's economic times some families may depend heavily on wild game to feed themselves, and hunting is a right granted to us through treaties, we cannot stress enough the importance our fish and wildlife play in our lives as Indian people. We must respect our wild game as our fore fathers and elders have taught us. We were taught to respect our fish and wildlife, not to waste any parts, of the wildgame. We were further taught to hunt only during certain times of the year.
 Most of our tribal members who have respect for our elders and our sacred ceremonies still abide by these customs. Those that would kill 14 elk, 8 deer or larger quantities seem to have lost their respect for our big game herds and their importance to us as Indian people for now and the future.
 It is with this view in mind that we ask members of the Shoshone and Arapahoe Tribes to think of our Fish and Wildlife in a respectful way, so that we can enjoy full use of our sovereign rights as Indian nations and to ensure that future generations will have these valuable resources."
 Rec., vol. IV, intervening def. ex. A.
 
 
 [4]
 The form of each affidavit was as follows:
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 Rec., vol. I, at 112-61.
 
 
 [5]
 The Government refers us to United States v. Eberhardt, 789 F.2d 1354 (9th Cir.1986), which relied solely on sections 2 and 9 to hold that the Department of the Interior has authority to regulate Indian fishing on the Hoopa Valley Indian Reservation, consistent with its obligations to manage and conserve Indian resources. In the present case, the Secretary relies on the treaty with the Shoshone, in addition to sections 2 and 9. Because we find that the Treaty provides the Secretary with authority to protect the Shoshone's right to reservation resources when the Shoshone request assistance, we need not decide whether sections 2 and 9 alone could support the regulations
 
 
 [6]
 Although the district court order cites only Sec. 553(d)(3), it is evident that the court, in finding "good cause for immediate effectiveness," rec., vol. I, at 172, and in denying the Arapahoe's request for a TRO, found good cause under both Sec. 553(d)(3) and Sec. 553(b)(B)
 
 
 [7]
 Under the circumstances of this case, the proceedings on the TRO were the same as a preliminary injunction hearing for purposes of Rule 65(a)(2). Compare Fed.R.Civ.P. 65(b) with Fed.R.Civ.P. 65(a)