799 A.2d 629 (2002)
352 N.J. Super. 45
The AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY, INC. and Deborah Jacobs, Plaintiffs-Respondents/Cross-Appellants,
v.
COUNTY OF HUDSON, Ralph Green, as Director of the Hudson County Department of Corrections and Custodian of Records of the Hudson County Jail, County of Passaic, and Felix Garcia, as Warden and Custodian of Records of the Passaic County Jail, Defendants/Third-Party Plaintiffs-Respondents/Cross-Appellants,
v.
United States of America, Defendant/Intervenor/Third-Party Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 20, 2002.
Decided June 12, 2002.
*635 Robert D. McCallum, Jr. (Assistant Attorney General of the United States) of the Georgia bar, admitted pro hac vice, Atlanta, GA, and Thomas M. Bondy (United States Department of Justice) of the California bar, admitted pro hac vice, argued the cause for appellant United States of America (Christopher J. Christie, United States Attorney for the District of New Jersey, Cranford, attorney; Messrs. McCallum, Bondy and Christie on the brief together with Michael Chagares, Thomas Calcagni, Gregory G. Katsas, Mark B. Stern and Katherine S. Dawson).
Ronald Chen (Rutgers Constitutional Litigation Clinic), Newark, argued the cause for respondents The American Civil Liberties Union of New Jersey and Deborah Jacobs (Mr. Chen, attorney, and on the brief together with Penny Venetis, Newark, Edward Barocas, West Orange and Howard Moskowitz, Jersey City).
William J. Pascrell, III, Passaic County Counsel, attorney for respondents Passaic County and Felix Garcia (Matthew Malfa, Secaucus, on the brief).
Joseph S. Sherman, Hudson County Counsel, attorney for respondents Hudson County and Ralph Green (Michael J. Dermody, Jersey City, appearing).
Arlene M. Turinchak, Somerset, argued the cause for amicus curiae North Jersey Media Group (McGimpsey & Cafferty, attorneys; Ms. Turinchak, on the brief with Thomas J. Cafferty).
Before Judges KESTIN, STEINBERG and ALLEY. *630 *631 *632 *633
*634 The opinion of the court was delivered by KESTIN, J.A.D.
Defendant-intervenor, the United States of America (the United States or the government), appeals from the trial court's order and judgment requiring defendants, the counties of Hudson and Passaic and the administrators of those counties' jails (collectively, the counties), to disclose pedigree data and other specified information pertaining to certain inmates, including those in the counties' care pursuant to contracts with the Immigration and Naturalization Service (INS). Plaintiffs, the American Civil Liberties Union of New Jersey and Deborah Jacobs, its executive director, cross-appeal from the trial court's grant of the government's motion to intervene. The counties each cross-appeal, conditionally in the event the order granting intervention is reversed, from the trial court's order dismissing their third-party complaints against the INS. As to the appeal, we reverse; as to plaintiffs' cross-appeal, we affirm; and we dismiss the counties' cross-appeals.

I
The complaint alleges the counties' "unlawful refusal to make available to plaintiffs public records for inspection and copying as required by N.J.S.A. 30:8-16; N.J.S.A. 30:8-2; N.J.A.C. 10A:31-6.5; the [then effective] Right-to-Know Law, N.J.S.A. 47:1A-1 [to -4];[*] and/or the common-law right of access to public records, as to all persons confined in the Hudson County Jail and in the Passaic *636 County Jail since September 1, 2001." The complaint states further: "This action is premised exclusively on and demands relief solely pursuant to New Jersey law."
The matter came before the trial court on cross-motions for summary judgment. The intervention motion of the United States having previously been granted, the government participated as a defendant. On April 12, 2002, the trial court granted the disclosure plaintiffs sought on all bases advanced except the common law right of access. The latter claim was "dismissed with prejudice for plaintiffs' failure to respond to the motion of defendant-intervenor United States for summary judgment with respect thereto." There is no appeal from that dismissal. The order and judgment also dismissed the counties' third party complaints. Allowing time for an appeal, the trial court stayed enforcement of the disclosure order for ten days.
Shortly after filing its notice of appeal, the government moved before us, on an emergent basis, for a continuation of the stay pending appeal and for an acceleration of the appeal. On April 19, 2002, following oral argument of the motion by telephone, we granted those motions
on the condition that the status quo will be maintained pending the outcome of the appeal, i.e., no INS detainee in the Hudson County or Passaic County jails will be removed from his or her current location except on consent (with the assistance of counsel of the individual's choice).
In an April 26 consent order entered on emergent cross-motions, we clarified the condition to permit the following:
1. The removal of any detainee who has agreed to voluntary departure.
2. The removal of any detainee with a final removal order who exhibits his consent to such removal by signing a form setting forth that consent.
3. The removal of any detainee who is authorized to leave the jail on bond.
4. The temporary removal of any detainee, such as for transportation to immigration or other court hearings, medical matters, or the like.
5. The removal of any detainee who is actually represented by counsel.

II
The appeal comes before us on an attenuated factual record consisting entirely of documents. The background facts are contained in a January 11, 2002 declaration (see 28 U.S.C.A. § 1746) by James S. Reynolds, Chief of the Terrorism and Violent Crime Section in the Criminal Division of the United States Department of Justice. That document, prepared as a certification for a matter pending in the United States District Court for the District of Columbia, was before the trial court in the instant matter.
According to Reynolds, following the September 11, 2001 attacks on the World Trade Center and the Pentagon, the United States government launched an extensive, world-wide investigation into terrorist activity and those who might attempt future terrorist attacks against United States citizens and interests. As part of this investigation, federal agents have attempted to apprehend those responsible for the September 11 attacks and to detect and dismantle terrorist organizations. The effort is "open and ongoing."
Federal agents have questioned over 1000 individuals in connection with the investigation. Some of the individuals questioned were taken into custody for alleged violations of federal criminal law or under material witness warrants pursuant to 18 U.S.C.A. § 3144. Others, determined to be in violation of federal immigration law, were detained by the INS.
*637 Certain INS detainees are housed in the Hudson County Correctional Center and the Passaic County Jail pursuant to long-standing contracts between the INS and the counties. In the Passaic County contract, signed in January 1985,
[t]he County agrees to accept and provide for the secure custody, care and safekeeping of U.S. INS detainees in accordance with state and local laws, standards, policies, procedures, or court orders applicable to the operations of the facility.
The Hudson County contract, of unspecified date, recites that
[t]he Contractor will provide housing, safekeeping, subsistence and other services for INS detainee(s) within its facility..., consistent with the types and levels of services and programs routinely afforded its own population, and fully consistent with all applicable laws, standards, policies, procedures and court orders applicable to its facility ..., unless or as specifically modified by this Agreement.
According to the Reynolds certification, the federal government has ordered withheld the names of these detainees, the locations where they were initially arrested or detained, the locations where they are being held, the dates of their detention, and the names of their attorneys.
In addition to describing the extent of the government investigation in the wake of the September 11, 2001 attacks, the Reynolds certification states that disclosing information about INS detainees could harm the United States and the detainees by subjecting the detainees or their families to intimidation at the hands of terrorists; deterring the detainees from cooperating with the government and impairing their usefulness in ongoing investigations; revealing the direction and progress of the investigations by identifying where the government is focusing its efforts; allowing terrorist organizations to interfere with pending proceedings by creating false or misleading evidence; and facilitating contact between detainees and members of terrorist organizations. Reynolds asserts that the detainees have a substantial privacy interest in their names and an overwhelming interest in not being associated with the September 11 attacks. According to him, all detainees have the right to retain counsel and many have done so. Further, according to Reynolds, any detainee who wishes to disclose his or her name may do so.
On November 28, 2001, plaintiffs' representative wrote to defendant Ralph Green, the Director of the Hudson County Department of Corrections and custodian of records for the Hudson County Correctional Center, and to defendant Felix Garcia, Warden and custodian of records for the Passaic County Jail, requesting copies of records pertaining to each person committed to those facilities since September 1, 2001. The information requested was the name of each such person as well as
his or her: (a) age, (b) birthplace, (c) nationality, (d) date of entry, (e) date of discharge, (f) reason for confinement, (g) whether or not he or she is or was being held in [the respective institution] pursuant to an agreement or contract with any federal agency and, if so, the name of the agency, and (h) whether or not he or she is represented by counsel and, if so, the name of counsel.
In a letter dated December 10, 2001, Passaic County Counsel's office informed plaintiffs that the INS had directed the Passaic County Sheriff's Department not to release any information regarding INS detainees committed to the Passaic County Jail. Counsel nevertheless offered to provide plaintiffs with the information they requested regarding all non-INS detainees *638 in the Passaic County Jail. In a letter dated January 11, 2002, Hudson County Counsel's office informed plaintiffs that because federal detainees housed in the Hudson County Correctional Center were under the sole authority of the federal government, the County was not permitted to release the information that plaintiffs had requested. Hudson County also offered to gather and release the requested information for all other inmates.
On January 23, 2002, counsel for the INS wrote to Passaic County Counsel formally requesting that the County withhold all information relating to INS detainees in its jail. The letter stated that release of information about the detainees might constitute an invasion of their personal privacy and interfere with ongoing law enforcement proceedings.

III
As presented on appeal, plaintiffs' statutory claims for the information sought arise from this State's general legislation governing access to public records (the Right-to-Know Law) in effect at the time, N.J.S.A. 47:1A-1 to -4, and, more specifically, from a so-called Jailkeeper's Law, N.J.S.A. 30:8-16, which provides:
The keeper of every jail or other penal or reformatory institution supported by public moneys of any county or municipality, shall keep a book provided by the board of freeholders in the county where the institution shall be, in which he shall set forth the date of entry, date of discharge, the description, age, birthplace and such other information as he may be able to obtain as to the inmates committed to his care, which book shall be exposed in a conspicuous place in the institution and shall be open to public inspection.
Plaintiffs also rely upon a public records provision of Department of Corrections regulations governing adult county correctional facilities, N.J.A.C. 10A:31-1.1 to -29.1:
The following information and documents regarding an adult inmate or parolee shall be available for public inspection and copying:
1. Name;
2. Number;
3. Sentence;
4. Place of incarceration;
5. Order of Commitment; and
6. Any documents filed in a court of competent jurisdiction.
[N.J.A.C. 10A:31-6.5(a).]
Judge D'Italia, expressing his views orally and in a superseding written opinion, ruled in plaintiffs' favor. He held the statutes to be independent of each other and co-existent. He viewed the statutes to be clear and unqualified in their purport, requiring the county defendants to make the disclosures sought because the INS detainees were plainly inmates of the jails. Judge D'Italia rejected the government's arguments that Governor Whitman's Executive Order No. 69 (1997) or a confidentiality regulation, N.J.A.C. 10A:31-6.6, were within any statutorily created exceptions to the legislated disclosure requirements that applied here.
On April 17, 2002, five days after the trial court's order and judgment were entered, the INS promulgated as an "interim rule" a regulation barring disclosure of the information sought here, 8 C.F.R. § 236.6 (2002). It provides:
No person, including any state or local government entity or any privately operated detention facility, that houses, maintains, provides services to, or otherwise holds any detainee on behalf of the Service (whether by contract or otherwise), and no other person who by virtue *639 of any official or contractual relationship with such person obtains information relating to any detainee, shall disclose or otherwise permit to be made public the name of, or other information relating to, such detainee. Such information shall be under the control of the Service and shall be subject to public disclosure only pursuant to the provisions of applicable federal laws, regulations and executive orders. Insofar as any documents or other records contain such information, such documents shall not be public records. This section applies to all persons and information identified or described in it, regardless of when such persons obtained such information, and applies to all requests for public disclosure of such information, including requests that are the subject of proceedings pending as of [April 17, 2002].
In addition to the arguments it advanced in the trial court, the United States contends on appeal that 8 C.F.R. § 236.6 preempts State law and forbids disclosure of the requested information. By way of response, in addition to the arguments they advanced in the trial court, plaintiffs contend that State law is not pre-empted by 8 C.F.R. § 236.6 because promulgation of that regulation exceeded the federal agency's authority and failed to follow the notice, publication and comment procedures mandated by the federal Administrative Procedure Act, 5 U.S.C.A. § 553. Plaintiffs further contend that the regulation is invalid because it applies retroactively and because it violates state autonomy under the Tenth Amendment to the United States Constitution. They argue also that well-established precepts of international law support granting the relief they request.

IV
As we explore the issues presented, we are guided by the wisdom of the second Justice Harlan: "In order to lay hands on the precise issue[s] which this case involves, it is useful first to canvass various matters which this record does not present." Cohen v. California, 403 U.S. 15, 18, 91 S.Ct. 1780, 1784, 29 L.Ed.2d 284, 289 (1971).
The rights of the detainees to representation by counsel, or to consular notice and assistance, or to other access, including information on file, see Tran v. United States Dep't of Justice, 2001 WL 1692570 (D.D.C.2001)(decided Nov. 20, 2001), are not before us. Those interests have not been directly pleaded, and the standing of the plaintiffs in this matter to raise those rights is doubtful even in the context of New Jersey's liberal standing rules, see, e.g., New Jersey Builders Ass'n v. Mayor and Township Comm. of Bernards Township, 108 N.J. 223, 227, 528 A.2d 555 (1987); Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107-08, 275 A.2d 433 (1971); Triffin v. Somerset Valley Bank, 343 N.J.Super. 73, 81, 777 A.2d 993 (App.Div.2001); United Prop. Owners Ass'n of Belmar v. Borough of Belmar, 343 N.J.Super. 1, 50, 777 A.2d 950 (App.Div.), certif. denied, 170 N.J. 390, 788 A.2d 774 (2001), especially where the public interest is involved, see Jersey Shore Med. Ctr.Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 144, 417 A.2d 1003 (1980). Nevertheless, we have been aware throughout that such interests may be at the root of the relief plaintiffs seek. The conditions attached to our order extending the trial court's stay were informed by these concerns, and we requested the parties to brief certain issues so that we might have fuller perspective regarding these ancillary questions.
We are not confronted here with First Amendment claims, or the parallel guarantees of N.J. Const. art. I, ¶ 6, bearing upon *640 the INS's non-disclosure policies, either before the promulgation of 8 C.F.R. § 236.6 or since, such as have been before several federal courts of late, most recently in North Jersey Media Group v. Ashcroft, 205 F.Supp.2d 288 (D.N.J.2002); see also Detroit Free Press v. Ashcroft, 195 F.Supp.2d 937 (E.D.Mich.2002); Schiller v. Immigration and Naturalization Serv., 205 F.Supp.2d 648 (W.D.Tex.2002). The issues raised before us are purely those of statutory interpretation and implementation.
Other issues of access to INS proceedings or information are also not before us, as they were before the court in North Jersey Media Group. Our entire focus is on the statutory duties of defendant counties and the discharge of those duties, albeit in the light of arguments raising issues of superseding federal law.
Given that the issues squarely framed on appeal bear only on plaintiffs' statutory rights of access to public records, questions of whether and the extent to which international law guarantees have been denied to the INS detainees are not before us, either. Plaintiffs argue, in general, that secret detention is anathema to the civilized nations of the international community. They claim specifically that the arrests and detentions referenced in this matter represent violations of treaties to which the United States is a signatory, including the Vienna Convention on Consular Relations and Optional Protocol on Disputes, November 12, 1969, art. 36(1)(b), 21 U.S.T. 77, which mandates that a foreign national who is detained in any of the countries bound by the treaty be granted access to his or her consulate; and the Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. GAOR, U.N. Doc. A/810 (1948), and the International Covenant on Civil and Political Rights, G.A. Res. 2200A(XXI), U.N. GAOR, U.N. Doc. A/6316 (1966) ("ICCPR"), both of which prohibit arbitrary arrest, detention or exile. We are cognizant of our duties under the United States Constitution to construe State statutes and such federal laws as may come before us agreeably to any treaties to which the United States may be a party, for such treaties are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Given the relief sought in the complaint and the limited record developed in the trial court, however, the detainees' international law rights have not been properly raised or developed.
In canvassing the matter to exclude issues not presented, we are also obliged to note a new question that was not before the trial court. Promulgation of 8 C.F.R. § 236.6 since the trial court's ruling has transformed the issues in the matter, adding pre-emption questions that were not before the trial court.

V
We need not be unduly detained by the cross-appeals.

A.
Plaintiffs argue in their cross-appeal that the trial court erred in granting intervenor status to the United States and that the proper role for the United States would have been as an amicus curiae. They contend that: the United States failed to follow mandatory court procedures in making its motion for intervention; the United States is a stranger to the action; the United States has no cognizable interest in the matter; the United States failed to demonstrate that its interests could not be protected by Hudson County and Passaic County; and that granting intervenor status to the United States prejudiced plaintiffs' interests.
*641 In granting the government's motion to intervene, Judge Gallipoli correctly noted that such applications should be entertained with liberality. He found that the United States had substantially complied with R. 4:33-3, because an answer had been filed as of the time of the hearing on the motion, and because the certification attached to the moving papers clearly set forth the reasons why the United States sought intervention. The judge further found that the interests of the United States could not be protected by the counties because "the real party in interest here is the United States of America and presumably it has the intimate knowledge as to what is going on with regard to the continuing investigation and why it believes ... that the names of these particular detainees should not be disclosed." We agree substantially with Judge Gallipoli's reasoning.
R. 4:33-3 provides that "[a] person desiring to intervene shall file and serve on all parties a motion to intervene stating the grounds therefor and accompanied by a pleading setting forth the claim or defense for which intervention is sought." Here, the government's motion to intervene was not accompanied by a pleading, although it was supported by the Reynolds certification.
The grant or denial of a motion to intervene based upon a movant's compliance with R. 4:33-3 lies within the sound discretion of the trial court and should not be disturbed on appeal absent a clear showing that the trial court's discretion has been misapplied. State v. Lanza, 39 N.J. 595, 600, 190 A.2d 374 (1963), cert. denied, 375 U.S. 451, 84 S.Ct. 525, 11 L.Ed.2d 477 (1964); Township of Hanover v. Town of Morristown, 118 N.J.Super. 136, 141, 286 A.2d 728 (Ch.Div.), aff'd, 121 N.J.Super. 536, 298 A.2d 89 (App.Div. 1972), certif. denied, 62 N.J. 427, 302 A.2d 131 (1973); Clarke v. Brown, 101 N.J.Super. 404, 411, 244 A.2d 514 (Law Div.1968).
In Lanza, supra, 39 N.J. at 600, 190 A.2d 374, the Supreme Court upheld the trial court's denial of a party's motion to intervene. Yet, it did not do so solely on the basis of failure to submit proper responsive pleadings, as plaintiffs contend. Rather, the Court found that the matter's protracted and difficult procedural history necessitated clear proof of justification to intervene and, considering all the circumstances of the case, the movant had not satisfied the requirements of the rules. Ibid.
In City of Clifton v. Cresthaven Cemetery Ass'n, 17 N.J.Super. 362, 364-65, 86 A.2d 257 (App.Div.1952), we upheld the denial of a motion to intervene based upon the movant's failure to accompany his motion with a pleading setting forth the claim or defense for which intervention was sought. We noted that a petition the movant had included with his motion contained irrelevant and confusing material which did not provide sufficient factual support for his claim of interest. Id. at 365, 86 A.2d 257. Despite these deficiencies, we nevertheless concluded that the movant should be given another opportunity to file a motion to intervene that would comply with requirements of the court rules. Ibid.
Neither Lanza nor Cresthaven stands for the proposition that strict compliance with R. 4:33-3 is required before a motion to intervene may be granted. In each case, the matter's procedural history, the movant's good faith, and the sufficiency of the materials submitted with the motions were considered before a determination was made that a denial of intervention had been warranted. More importantly, both cases clearly established that movants are, with liberality, to be afforded reasonable *642 opportunities to cure procedural defects in their motions to intervene.
In the matter at hand, the United States filed its motion to intervene within one month of the institution of suit and before any substantive rulings had occurred in the case. There is no indication in the record that the government intentionally delayed its response to plaintiffs' complaint or otherwise, procedurally, exhibited a lack of good faith in its actions. Further, the certification that was attached to the government's motion clearly set forth the nature and quality of its interest and the reasons it was opposing plaintiffs' disclosure claim. Finally, although the United States did not attach its formal answer to the motion, it did file the answer on the date of the hearing. In these circumstances, failure to include an answer with the initial motion cannot be considered fatal to the government's application, for it could simply have renewed its motion to intervene at the time of the hearing and attached the answer to the motion made at that time. See Lanza, supra, 39 N.J. at 600, 190 A.2d 374.
R. 1:1-2 allows a court to relax a rule in the interests of justice, unless the rule expressly states otherwise. Neither R. 4:33-3 nor the cases addressing it prohibit relaxation of the pleading requirements for motions to intervene. Because the United States substantially complied with the requirements of R. 4:33-3, Judge Gallipoli did not misapply his discretion in declining to deny intervention on procedural grounds.
To intervene as of right under R. 4:33-1, a movant must
(1) claim "an interest relating to the property or transaction which is the subject of the transaction," (2) show [that the movant] is "so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest," (3) demonstrate that the "[movant's] interest" is not "adequately represented by existing parties," and (4) make a "timely" application to intervene.
[Meehan v. K.D. Partners, L.P., 317 N.J.Super. 563, 568, 722 A.2d 938 (App.Div.1998) (quoting Chesterbrooke Ltd. P'ship v. Planning Bd., 237 N.J.Super. 118, 124, 567 A.2d 221 (App.Div.), certif. denied, 118 N.J. 234, 570 A.2d 984 (1989)).]
The substance of the rule permitting intervention as of right is also ordinarily construed quite liberally. Ibid. Further, "[a]s the rule is not discretionary, a court must approve an application for intervention as of right if the four criteria are satisfied." Ibid.
R. 4:33-1 simply requires the movant to claim "`an interest' relating to the property or transaction which is the subject of the action." Atlantic Employers Ins. Co. v. Tots & Toddlers Pre-School Day Care Ctr., 239 N.J.Super. 276, 280, 571 A.2d 300 (App.Div.), certif. denied, 122 N.J. 147, 584 A.2d 218 (1990). In Atlantic Employers, the court held that plaintiffs in tort actions had sufficient interests in the terms of their defendants' insurance policy to intervene as of right in a declaratory judgment action brought by the insurance company against the defendants. Ibid. In Meehan, the court held that a property owner's interest in the development of an adjacent parcel was sufficient to warrant intervention as of right in an action in lieu of prerogative writs challenging the grant of a use variance. 317 N.J.Super. at 571, 722 A.2d 938.
The interests of the United States in the instant matter are clearly adequate when measured by the normative standards applied to the movants in Atlantic Employers and Meehan. Although plaintiffs *643 characterize this matter as simply their effort to compel ministerial action on the part of county officials through the application of State law, the real subjects of the dispute are the information relating to INS detainees and the government's claim of confidentiality. All the information concerning the detainees currently possessed by the counties was provided to them by the United States. The government asserts a supervening interest in this information because it claims disclosure would jeopardize ongoing law enforcement efforts, endanger individuals engaged in those law enforcement efforts, endanger INS detainees and their families, and impair the government's ability to investigate and disrupt terrorist networks at home and overseas.
Plaintiffs cite Wade v. Goldschmidt, 673 F.2d 182 (7th Cir.1982), which addresses Fed.R.Civ.P. 24(a)(2), as requiring that the proposed intervenor have a cognizable interest in the object of the litigation and not merely its subject. To the extent a construal of a correlative federal court rule has any bearing upon our understanding of a State court rule, we reject the semantic distinction, at least as plaintiffs seek to apply it in this case. The object of this litigation can certainly be characterized as the disclosure of information relating to INS detainees. Moreover, even under the standard set forth in Wade, the United States has shown "a direct, significant legally protectable interest in the property or transaction subject to the action." 673 F.2d at 185.
Moreover, under R. 4:33-1, the United States has established that consideration of the subject matter has a significant bearing on the government's ability to protect its interests. See Atlantic Employers, supra, 239 N.J.Super. at 280, 571 A.2d 300 (establishing as a test that "disposition of the action may, as a practical matter, impair or impede [the movant's] ability to protect [its] interest"). Accepting the Reynolds certification at face value for intervention-motion purposes, disclosure of the requested information will have a direct and immediate impact on government law enforcement investigations and personnel. Obviously, there is no way the United States might remedy the effect of disclosure once it has taken place.
Also, the United States has demonstrated that its interests cannot be adequately protected by the counties. The United States, alone, is in the position to support its claim. The counties are not privy to the character and extent of federal investigations in progress nor, apparently, do they possess any independently acquired information regarding the role of the INS detainees in those investigations.
Plaintiffs' reliance on Cresthaven, supra, 17 N.J.Super. at 365, 86 A.2d 257, in support of their argument concerning adequacy of representation is unavailing. In that case, we did not deny the pro se movant's request to intervene on the basis that he was already adequately represented, but rather we allowed him an additional opportunity to file a motion to intervene because he may not have been adequately represented by the other defendants. Ibid.
Finally, with regard to whether the United States made a timely application to intervene, we note that plaintiffs filed their complaint on January 22, 2002, and the government's application was heard on February 27, 2002. This was only one day after the original defendants had filed their answers, and before any appearances or rulings occurred in the case. Thus, the circumstances of the government's motion are markedly different from those in Clarke, supra, 101 N.J.Super. at 411, 244 A.2d 514, for example, where the application *644 to intervene was made after judgment had been entered.
Whether intervention as of right should be granted may be determined by evaluating the extent to which a grant "of the motion will unduly delay or prejudice the rights of the original parties." Atlantic Employers, supra, 239 N.J.Super. at 280, 571 A.2d 300 (quoting Looman Realty Corp. v. Broad St. Nat. Bk., 74 N.J.Super. 71, 78, 180 A.2d 524 (App.Div.), certif. denied, 37 N.J. 520, 181 A.2d 782 (1962)). Although plaintiffs claim that the government's intervention prejudiced their rights, they have provided no explanation of the nature or extent of the asserted prejudice to them, as distinguished from the detainees whom they wish to serve. Rather, plaintiffs merely contend that they had a right of access to the requested documents in a timely fashion so that they could promptly provide INS detainees with legal assistance, consular access, and the like. The delay engendered by the grant of intervenor status to the United Statesat most, eighteen days did not so materially prejudice plaintiffs' position in the litigation as to be dispositive in the light of the quality of the interest asserted by the United States.
Because the United States fully satisfied all four prongs of the R. 4:33-1 test, it was entitled to intervene in this litigation as a matter of right. The trial court's grant of the government's motion to intervene is therefore affirmed.
We note also that "[w]here intervention of right is not allowed, one may obtain permissive intervention under R. 4:33-2." Atlantic Employers, supra, 239 N.J.Super. at 280, 571 A.2d 300. The rule permits intervention at the trial court's discretion if the applicant's "claim or defense and the main action have a question of law or fact in common." R. 4:33-2.
The factors to be considered by the trial court, which should ordinarily be liberal in its grant of the motion, are the promptness of the application, whether or not the granting thereof will result in further undue delay, whether or not the granting thereof will eliminate the probability of subsequent litigation, and the extent to which the grant thereof may further complicate litigation which is already complex.
[Pressler, Current N.J. Court Rules, comment on R. 4:33-2 (2002) (citation omitted).]
"R. 4:33-2 is to be liberally construed by trial courts with a view to whether intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 341, 676 A.2d 1065 (1996) (citations omitted).
Plaintiffs also argue that the government's proper role in this matter was as amicus curiae rather than as an intervening defendant. The trial court was manifestly correct to decide the intervention motion by determining whether the United States had met the standards of the rules governing intervention. The movant's alternative qualification to appear as an amicus was not a factor to be considered in determining whether to grant or deny the intervention motion.

B.
The county defendants' conditional cross-appeals are rendered moot by reason of our affirmance of the trial court's grant of the motion to intervene. Those appeals must therefore be dismissed.

VI
Judge D'Italia delivered an oral opinion at the close of arguments on the cross-motions for summary judgment on March *645 26, 2002. Some two weeks later, on April 12, 2002, the parties were before the trial court again, on a motion to settle the form of the order. Judge D'Italia noted that he had filed and posted on the Internet a written opinion amending and superseding his oral opinion. In that written opinion, Judge D'Italia expressed his reasons for interpreting and applying the Jailkeeper's Law and the Right-to-Know Law, as well as applicable Department of Corrections regulations, to grant the relief plaintiffs sought. We need not address the State law issues, because we have determined that State law has been pre-empted by federal law.

VII
The matter is before us as a challenge to Judge D'Italia's views of the requirements of State law. Without addressing the validity of those views, they provide a point of departure in our consideration of the substantive issues in the case. For the reasons that follow, we are constrained to reverse Judge D'Italia's order and judgment because of the federal regulatory development post-dating his opinion and entry of the order and judgment based thereon, i.e., the promulgation of 8 C.F.R. § 236.6.

A.
Typically, when an arguably superseding legislative, regulatory or decisional development occurs between the time a court rendered its decision and appellate consideration of the judgment or order, the matter will be remanded for reconsideration in the light of the new development. See, e.g., S.D. v. Division of Med. Assistance & Health Servs., 349 N.J.Super. 480, 484-85, 793 A.2d 871 (App. Div.2002). In addition to providing the reviewing court with the lower court's insights regarding the effect of the new development upon the issues at hand, the practice of remanding furthers the principle of Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973), which normally precludes consideration on appeal of an issue not previously raised.
The Nieder rule is not without its exceptions, however. It does not apply where no opportunity existed to raise the focal issue previously, where the issue raises a question of jurisdiction, or where it is one of great public interest. Ibid. Manifestly, this case qualifies under the first and third exceptions. Moreover, the Nieder rule's exceptions are most fruitfully applied where the focal issue is entirely a question of law, in respect of which lower court determinations are accorded limited deference. See generally Balsamides v. Protameen Chems. Inc., 160 N.J. 352, 372, 734 A.2d 721 (1999).
The United States argues that 8 C.F.R. § 236.6 pre-empts any inconsistent State law and therefore precludes the counties from releasing the information requested by plaintiffs. The government contends that the INS was acting well within its delegated scope of authority in promulgating the regulation and that adoption as an emergency interim rule was justified by the good cause exceptions of the federal Administrative Procedure Act ("APA"), 5 U.S.C.A. §§ 553(b)(B) and (d)(3). Further, the United States asserts that the regulation is applicable to all requests for public disclosure of the type of information specified, including requests that were the subject of proceedings pending as of April 17, 2002.
Plaintiffs respond that 8 C.F.R. § 236.6 is a nullity because Congress never delegated authority to the Attorney General or the Commissioner of the INS to pre-empt state law regarding the operation of local jails. Further, they contend *646 that the regulation was not promulgated in accordance with the APA.
Because 8 C.F.R. § 236.6 was not promulgated until after the issuance of Judge D'Italia's decision, the trial court did not have the opportunity to consider the effect of that regulation on the litigation. We note also in this connection, as a potentially overriding principle of State law, that N.J.S.A. 47:1A-2 specifically insulates from public access records which are exempted from disclosure by a federal regulation. This issue, too, was not implicated in the trial court's consideration of the matter because the regulation was not then extant.

B.
The pre-emption doctrine is rooted in the Supremacy Clause of Article VI of the United States Constitution, which declares that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; Feldman v. Lederle Labs., 125 N.J. 117, 133, 592 A.2d 1176 (1991), cert. denied, 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992). The supremacy concept must be applied in a principled way; it embodies a basic value of our federal system. Especially for a state court, the question is not always the extent to which state law or policy is superseded by federal law and never whether the supersession is palatable, but only one of paramountcy of the federal interest.
Pre-emption may be either express or implied, depending upon whether the pre-emptive intent "is explicitly stated in [a federal law's] language or implicitly contained in its structure [or] purpose." Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 152-53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 675 (1982) (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, 614 (1977)). "In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407, 423 (1992).
Thus, pre-emption will be implied "where it is impossible for a private party to comply with both state and federal law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372, 120 S.Ct. 2288, 2294, 147 L.Ed.2d 352, 361 (2000). "The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail." Fidelity Fed. Sav. & Loan Ass'n, supra, 458 U.S. at 153, 102 S.Ct. at 3022, 73 L.Ed.2d at 675 (quoting Free v. Bland, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180, 183 (1962)).
Pre-emption may result not only from action taken by Congress itself, but also from actions of federal agencies as well. See Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n, 476 U.S. 355, 369, 106 S.Ct. 1890, 1898-99, 90 L.Ed.2d 369, 382 (1986). Indeed, New Jersey has long recognized that "[f]ederal regulations have the same pre-emptive effect as federal statutes." Feldman, supra, 125 N.J. at 134, 592 A.2d 1176. "As long as the agency (1) intended to pre-empt state law; and (2) acted within the scope of its delegated authority, federal regulations will displace conflicting state laws." R.F. v. Abbott Labs., 162 N.J. 596, 619, 745 A.2d 1174 (2000).
The trial court held several State laws to mandate that information be provided to plaintiffs concerning the federal detainees. However, the plain language of 8 C.F.R. § 236.6 prohibits the disclosure of such *647 information. There is, therefore, a clear conflict between State law as posited by the trial court and the federal regulation because compliance with both would be impossible. See Fidelity Fed. Sav. & Loan Ass'n, supra, 458 U.S. at 153, 102 S.Ct. at 3022, 73 L.Ed.2d at 675.
Plaintiffs' argument that New Jersey's public access laws do not conflict with 8 C.F.R. § 236.6 because there is no direct conflict between the federal enabling legislation and N.J.S.A. 30:8-16 betokens a misunderstanding of the pre-emption doctrine. It is not necessary for there to be a direct conflict between a federal statute and a state statute. Pre-emption occurs when "compliance with both federal and state regulations is a physical impossibility." Fidelity Fed. Sav. & Loan Ass'n, supra, 458 U.S. at 153, 102 S.Ct. at 3022, 73 L.Ed.2d at 675 (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248, 257 (1963)). Where there is an operational conflict, a federal regulation will pre-empt state law if its promulgation was within the scope of the agency's delegated authority and in compliance with the procedural provisions of the APA.
The United States argues that, in promulgating 8 C.F.R. § 236.6, the Commissioner of the INS acted within his broad scope of authority to regulate all matters pertaining to immigration and naturalization. The government contends that authority to promulgate the regulation can also be found in the Attorney General's overriding responsibility to safeguard national security.
It is well established "that a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority[,] ... [for] an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." New York v. Federal Energy Regulatory Comm'n, ___ U.S. ___, ___, 122 S.Ct. 1012, 1023, 152 L.Ed.2d 47, 62-63 (2002) (quoting Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n, supra, 476 U.S. at 374, 106 S.Ct. at 1901, 90 L.Ed.2d at 385).
When determining whether an agency acted within the scope of its authority in promulgating a regulation, courts do not invoke a presumption against pre-emption. New York v. Federal Energy Regulatory Comm'n, supra, ___ U.S. at ___, 122 S.Ct. at 1023, 152 L.Ed.2d at 62-63. Rather, the court must examine the nature and scope of the authority granted by Congress to the agency in order to ascertain whether the agency had the power to act. Ibid.
"Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily." Fidelity Fed. Sav. & Loan Ass'n, supra, 458 U.S. at 153-54, 102 S.Ct. at 3022-23, 73 L.Ed.2d at 675. When the administrator promulgates regulations which pre-empt state law, a court's inquiry is limited to determining whether the administrator's choice is a reasonable accommodation of conflicting policies. Id. at 154, 102 S.Ct. at 3023, 73 L.Ed.2d at 675. The administrator's discretion should be disturbed only if "it appears from the [enabling] statute or its legislative history that the accommodation is not one that Congress would have sanctioned." Ibid. (quoting United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908, 915 (1961)).
Congress has exclusive authority over matters involving naturalization and immigration. Nyquist v. Mauclet, 432 *648 U.S. 1, 10, 97 S.Ct. 2120, 2126, 53 L.Ed.2d 63, 71 (1977) (holding that control over immigration is entrusted to the federal government and a state has no power to interfere); Public Serv. Elec. & Gas Co. v. Werline, 322 N.J.Super. 216, 220, 730 A.2d 870 (App.Div.1999). Through the Immigration and Nationality Act ("INA"), 8 U.S.C.A. § 1101 to § 1537, Congress has delegated the administration and enforcement of the immigration and naturalization laws to the Attorney General of the United States. See Werline, supra, 322 N.J.Super. at 220, 730 A.2d 870 (citing 8 U.S.C.A. § 1103).
Courts "have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations." Immigration and Naturalization Service v. Aguirre-Aguirre, 526 U.S. 415, 425, 119 S.Ct. 1439, 1445, 143 L.Ed.2d 590, 601 (1999) (quoting Immigration and Naturalization Service v. Abudu, 485 U.S. 94, 110, 108 S.Ct. 904, 915, 99 L.Ed.2d 90, 105 (1988)); see also Mathews v. Diaz, 426 U.S. 67, 81 n. 17, 96 S.Ct. 1883, 1892 n. 17, 48 L.Ed.2d 478, 491 n. 17 (1976) (noting that because policies toward aliens are interwoven with the conduct of foreign relations, the war power, and the maintenance of a republican form of government, such matters are entrusted to the political branches of government and are largely immune from judicial inquiry or interference).
8 U.S.C.A. § 1103(a)(3) provides that the Attorney General "shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this [Act]." 8 U.S.C.A. § 1103(c) addresses the authority of the Commissioner of the INS. It provides that the Commissioner "shall be charged with any and all responsibilities and authority in the administration of the Service and of this [Act] which are conferred upon the Attorney General as may be delegated to him by the Attorney General or which may be prescribed by the Attorney General."
Pursuant to the authority granted by 8 U.S.C.A. § 1103(c), the Attorney General has delegated broad powers to the Commissioner "to direct the administration of the Service and to enforce the Act and all other laws relating to the immigration and naturalization of aliens. The Commissioner may issue regulations as deemed necessary or appropriate for the exercise of any authority delegated to him by the Attorney General...." 8 C.F.R. § 2.1 (2002).
Although there can be no question that, under the INA and its implementing regulations, the Commissioner has the authority to promulgate regulations relating to immigration and naturalization, it may be open to question whether 8 C.F.R. § 236.6 actually "relates" to immigration and naturalization, for the rule itself does not purport to regulate the conduct or status of aliens, nor does it address the legal processes afforded INS detainees. Rather, the regulation deals solely with public access to records concerning detainees. Thus, the real focus of the regulation, as evidenced by the rationale presented in its preamble, may be seen to be on the facilitation of law enforcement efforts in the wake of September 11. While plaintiffs acknowledge the Commissioner's authority to act in furtherance of the INA, they argue there is no indication the Commissioner has the authority to act on behalf of the Attorney General in matters of national security.
Nevertheless, we would breach faith with overarching principles of our *649 federalism if we were to see this case as an occasion for viewing the grant of authority to the Commissioner as anything but very broad. Although 8 C.F.R. § 236.6 might be primarily concerned with securing confidential information, it still relates to immigration and naturalization in several ways. We accept as not patently unrealistic the government's assertion that the regulation bears upon the privacy interests of those detainees who may not want to have their names made public and that it tends to affect the safety of the detainees and their families as well as others involved in the detention scheme. The further assertion that the regulation affects ongoing investigations into violations of the immigration laws is also not so far-fetched as to invite disbelief. Thus, we conclude that the regulation falls within the authority delegated to the Commissioner by Congress through the Attorney General.
With regard to the government's national security argument, there can be no question that the government of the United States has a compelling interest in securing the safety of the nation's citizens against terrorist attack. See Wayte v. United States, 470 U.S. 598, 611, 105 S.Ct. 1524, 1533, 84 L.Ed.2d 547, 558 (1985) (observing that "[f]ew interests can be more compelling than a nation's need to ensure its own security"). In Central Intelligence Agency v. Sims, 471 U.S. 159, 175-76, 105 S.Ct. 1881, 1890-91, 85 L.Ed.2d 173, 187-88 (1985), the Supreme Court refused to compel the CIA to reveal the identity of intelligence sources because doing so would impair the ability of the government to obtain information important to national security. The Court found that "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." Id. at 175, 105 S.Ct. at 1891, 85 L.Ed.2d at 187 (quoting Snepp v. United States, 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 765 n. 3, 62 L. Ed.2d 704, 708 n. 3 (1980)).
In Halkin v. Helms, 598 F.2d 1 (D.C.Cir.1978), the court observed that little reflection was required to understand that intelligence gathering in the computer age is like the construction of a mosaic where the importance of "one item of information may frequently depend upon knowledge of many other items of information. What may seem trivial to the uninformed may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." Id. at 8-9 (quoting United States v. Marchetti, 466 F.2d 1309, 1318 (4th Cir.), cert. denied, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972) (holding that the classification of information for security purposes is beyond the scope of judicial review)). Thus, the court held that when ruling on issues involving military or diplomatic secrets, a court need only be satisfied that there is a reasonable danger that disclosure of the information at issue will compromise national security. Id. at 9.
Yet, Sims, Halkin and Marchetti involved federal claims of "state secrets" and executive privileges that are not asserted in the case at hand. Is the Commissioner's authority to promulgate 8 C.F.R. § 236.6 to be seen as limited because none of these sanctioning cases involved the legitimacy of a regulation promulgated to prevent disclosure of sensitive information by a third party? We think not.
Plaintiffs argue that county jails are independent contractors over which federal officials have no control. They point out that neither of the contracts involved contains any language modifying their recitations that State law will control *650 with other specific language that the requirements of federal law supersede either state law or the expressed requirements of the contracts. Although that fact is not insignificant, we do not view it as the basis of a persuasive argument that the Commissioner exceeded his authority in promulgating 8 C.F.R. § 236.6. The conflict which gives rise to the pre-emption issue in this case is not, as plaintiffs contend, between the federal regulation and the operation of jails, even only under the contracts; rather, the conflict and the resultant pre-emption stem from the interplay between the federal regulation and State laws allowing public disclosure of inmate records. In any event, the pre-emption doctrine is not subject to limitation by any agreement of the parties. Cf. Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1, 16 (1981).
We will not assess the strength of the government's argument that national security interests create a generalized authority within the government to promulgate 8 C.F.R. § 236.6 or any other measures limiting the rights of individuals, for we view the government's argument based upon the delegation of authority under the INA to provide a sufficiently authoritative independent basis of support for the Commissioner's action. Because the regulation at issue relates to immigration and naturalization, and because the scope of federal power once exercised is plenary, see Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); Hodel, supra, 452 U.S. at 276, 101 S.Ct. at 2360, 69 L.Ed.2d at 16, we conclude that the regulation was promulgated within the scope of the Commissioner's delegated authority. The judgment of the Commissioner that information concerning INS detainees should not be divulged falls well within the discretion afforded him by the INA.

C.
Obviously, if 8 C.F.R. § 236.6 is invalid or unenforceable for any other reason, it is ineffective as a pre-empting provision.

(1)
The parties adopt conflicting positions on whether 8 C.F.R. § 236.6 was promulgated in accordance with the procedural requirements of the APA, 5 U.S.C.A. § 553. Plaintiffs contend that APA requirements were not met. The United States contends that non-compliance with the general notice requirements of the APA in this instance is excused because the regulation falls under the good cause exceptions found in 5 U.S.C.A. §§ 553(b)(B) and (d)(3).
Normally, where an issuing agency fails to comply with the procedural requirements of the APA, the substantive rule is invalid. San Diego Air Sports Ctr., Inc. v. Federal Aviation Admin., 887 F.2d 966, 971 (9th Cir.1989). The APA requires that general notice of proposed rule-making must be published in the Federal Register, unless persons subject thereto are named and served with actual notice; and that interested persons must be afforded an opportunity to participate in the rule-making through submission of comments. 5 U.S.C.A. §§ 553(b) and (c). "The required publication or service of a substantive rule must be made not less than 30 days before its effective date." 5 U.S.C.A. § 553(d). Nevertheless, the general notice requirement does not apply "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C.A. § 553(b)(B). Further, the publication or *651 service can be accomplished in less than the required thirty days as "provided by the agency for good cause found and published with the rule." 5 U.S.C.A. § 553(d)(3).
8 C.F.R. § 236.6 was promulgated as an interim rule, effective immediately upon signing. Notice of the rule-making was not published in the Federal Register, as required by 5 U.S.C.A. § 553(b), nor was the public afforded a comment period prior to promulgation, as required by 5 U.S.C.A. § 553(c). In the regulation's preamble, the INS stated that "[t]he Service's implementation of this rule as an interim rule, with provisions for post-promulgation public comments, is based on the `good cause' exceptions found at 5 U.S.C. 553(b)(B) and (d)(3)." As justification for the immediate promulgation of the rule, the INS cited the need to conceal investigative methods, protect detainees from retaliation, encourage detainees to provide valuable information, and further the investigation arising out of the September 11 attacks. It concluded:
In light of the national emergency declared by the President on September 14, 2001, ... with respect to the terrorist attacks of September 11, 2001, and the continuing threat by terrorists to the security of the United States, and the need immediately to control identifying or other information pertaining to Service detainees, there is good cause ... for dispensing with the requirements of prior notice....
Federal courts have held that exceptions to the provisions of 5 U.S.C.A. § 553 should be narrowly construed and only reluctantly countenanced. See, e.g., National Fed'n of Fed. Employees v. Devine, 217 U.S.App.D.C. 101, 671 F.2d 607, 610 (D.C.Cir.1982) (citing American Fed'n of Gov't Employees v. Block, 655 F.2d 1153, 1156 (D.C.Cir.1981); New Jersey Dep't of Envtl. Prot. v. United States Envtl. Prot. Agency, 626 F.2d 1038, 1045 (D.C.Cir.1980)). "Use of the exception should be limited to emergency situations, so that the section does not become an all-purpose escape clause. Moreover, the courts will closely examine the agency's proffered rationale." Ibid. In general, courts have upheld good cause exceptions when the need for a regulation is clearly immediate and, otherwise, where notice and comment could result in serious damage to important interests. Id. at 611-12.
In Northern Arapahoe Tribe v. Hodel, 808 F.2d 741, 752 (10th Cir.1987), the court upheld interim regulations restricting hunting on an Indian reservation, promulgated without prepublication notice and comment, because the imminent endangerment of wildlife constituted a good cause exception to the rule. In so concluding, the court noted that the agency bore the burden of demonstrating good cause and that the exception was "essentially an emergency procedure." Id. at 751.
With regard to § 553(b)(B), the court explained

"Impracticable" means a situation in which the due and required execution of the agency functions would be unavoidably prevented by its undertaking public rule-making proceedings. "Unnecessary" means unnecessary so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved. "Public interest" supplements the terms "impracticable" or "unnecessary;" it requires that public rule-making procedures shall not prevent an agency from operating, and that, on the other hand, lack of public interest in rule making warrants an agency to dispense with public procedure.
[Ibid. (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 14 (1945)).] *652 Concerning § 553(d)(3), the court noted that legitimate grounds for invoking the exception were "an urgency of conditions coupled with demonstrated and unavoidable limitations of time, and that the primary consideration was to be the convenience or necessity of the people affected." Id. at 752 (quoting United States v. Gavrilovic, 551 F.2d 1099, 1104 (8th Cir.1977) (internal quotations omitted)). "In determining whether to invoke the exception, the agency is required to balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable time to prepare for the effective date of its ruling." Ibid. (quoting Gavrilovic, supra, 551 F.2d at 1105).
Under the rationales of Devine and Northern Arapahoe, the reasons asserted by the INS to support a good cause exception in respect of the promulgation of 8 C.F.R. § 236.6 satisfy the requirements of both § 553(b)(B) and § 553(d)(3). The emergent nature of the litigation and the immediacy of the court orders created urgent conditions and severe limitations upon time. If the government did not act immediately, its interest in concealing the names of INS detainees would likely have been damaged. We accept the government's characterization of the interests affected as important, i.e., facilitation of law enforcement operations, the protection of detainees, and promotion of national security. Following the normal notice and comment procedures would have been "impracticable" as it would have ignored the proffered exigencies.
In these circumstances, reliance on the good cause exceptions to 5 U.S.C.A. § 553 for promulgation of 8 C.F.R. § 236.6 was proper. Thus, the regulation is not null and void for failure to comply with customary APA procedures.

(2)
Plaintiffs also contend that the regulation, designed to undo a judicial decree, is invalid as infelicitously timed. The United States argues that even though 8 C.F.R. § 236.6 was not promulgated until after the trial court entered judgment in favor of plaintiffs, the regulation nevertheless applies to plaintiffs' requests and bars disclosure of information regarding INS detainees. The government contends that, under well-established case law, the fact that the regulation was promulgated during the course of litigation does not nullify its effect.
8 C.F.R. § 236.6 states that it applies to all requests for public disclosure of information relating to any detainee, "including requests that are the subject of proceedings pending as of April 17, 2002." In the preamble to the regulation, the agency states that the rule applies "to all pending and future requests for disclosure of or proceedings concerning the release of the name, or related information, of detainees held on behalf of the Service, including requests that are the subject of proceedings or litigation as of the effective date of this rule."
It has long been held that if, subsequent to judgment but before the decision of an appellate court, a law intervenes to change the rule which governs, that law must be obeyed. United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49, 51 (1801). In such a case, the appellate court must decide according to the law as it exists at the time of its decision and, if necessary, "set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law." Ibid.; see also Miller v. French, 530 U.S. 327, 344, 120 S.Ct. 2246, 2257, 147 L.Ed.2d 326, 340 (2000) (holding that "it is the obligation of the last court ... that *653 rules on the case to give effect to Congress's latest enactment, even when that has the effect of overturning the judgment of an inferior court, since each court, at every level, must decide according to existing laws" (quoting Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 227, 115 S.Ct. 1447, 1457, 131 L.Ed.2d 328, 348 (1995))) (internal quotations omitted); Phillips v. Curiale, 128 N.J. 608, 615, 608 A.2d 895 (1992); Riggs v. Township of Long Beach, 101 N.J. 515, 521, 503 A.2d 284 (1986).
This rule applies equally to intervening regulations as well as statutes. U.S. v. Morton, 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680, 691-92 (1984). Further, it does not matter that the regulation was promulgated in response to the litigation. Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 741, 116 S.Ct. 1730, 1733, 135 L.Ed.2d 25, 31 (1996). "Litigation often brings to light latent ambiguities or unanswered questions that might not otherwise be apparent." Morton, supra, 467 U.S. at 835 n. 21, 104 S.Ct. at 2776 n. 21, 81 L.Ed.2d at 692 n. 21 (1984). Promulgating a regulation in response to a lawsuit only demonstrates that the suit brought a problem to light that should be addressed. Ibid.
Undeniably, adoption of the intervening regulation by the very governmental entity which was a losing party to the litigation, in order to nullify the adverse ruling, may seem unfair to the opposing party. We are, however, aware of no rule of law that limits the government's ability to respond to a perceived policy need by reason of its status as a party in litigation. Prevailing concepts of administrative law are to the contrary.
It is clear that 8 C.F.R. § 236.6 was designed to apply to plaintiffs' information request. As the matter currently pends before us, the regulation does not represent an unconstitutional encroachment on judicial power by the executive or legislative branches. See Miller, supra, 530 U.S. at 341-50, 120 S.Ct. at 2255-60, 147 L.Ed.2d at 338-44 (distinguishing between legislation that attempts to reopen final judgments of the court and legislation that alters the prospective effect of previously entered judgments). It is, in sum, of no legal consequence that the regulation may have been promulgated in specific response to the fact that plaintiffs prevailed in the trial court. Cf. Anderson, Clayton & Co. v. United States, 562 F.2d 972 (5th Cir.1977), cert. denied, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978).
We conclude, therefore, that 8 C.F.R. § 236.6 was duly promulgated within the scope of authority delegated to the Commissioner by Congress under the INA. The INS's failure to comply with the notice and comment requirements of the APA was justified under the good cause exceptions to 5 U.S.C.A. §§ 553(b)(B) and (d)(3). Finally, the regulation is applicable to plaintiffs' lawsuit under the venerable rule of The Schooner Peggy as extended in the modern era. See also Phillips, supra, 128 N.J. at 615, 608 A.2d 895.

(3)
Further by way of disputing the validity of 8 C.F.R. § 236.6, plaintiffs argue that "[c]ommandeering state officials to engage in secret detentions of federal inmates in a manner contrary to state law is an unconstitutional derogation of state autonomy and sovereignty that violates the Tenth Amendment of the United States Constitution." They contend that the decision to accept federal prisoners for commitment to state jails is a matter that reposes in the free choice of the states and not a matter delegated to the federal government by the Constitution.
*654 The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Thus, although the states unquestionably retain a significant measure of sovereign authority, they do so "only to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." United States Term Limits, Inc. v. Thornton, 514 U.S. 779, 801, 115 S.Ct. 1842, 1854, 131 L.Ed.2d 881, 899 (1995) (quoting Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 549, 105 S.Ct. 1005, 1017, 83 L.Ed.2d 1016, 1033 (1985)). In other words, "[i]f power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." New York v. United States, 505 U.S. 144, 156, 112 S.Ct. 2408, 2417, 120 L.Ed.2d 120, 137 (1992).
Among the powers delegated to Congress by Article I of the Constitution is the power "[t]o establish a uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. That the Constitution confers the power of naturalization exclusively on Congress cannot be controverted. Chirac v. Lessee of Chirac, 15 U.S. (2 Wheat.) 259, 269, 4 L.Ed. 234, 237 (1817). Further, Congress has the authority pursuant to U.S. Const. art. I, § 8, cl. 18, to make all laws which are "necessary and proper" for executing its powers. Thus, "[t]he National Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization." Graham v. Richardson, 403 U.S. 365, 377, 91 S.Ct. 1848, 1854, 29 L.Ed.2d 534, 544 (1971) (quoting Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 419, 68 S.Ct. 1138, 1142, 92 L.Ed. 1478, 1487 (1948)).
Because the power to regulate aliens is expressly delegated to Congress, it is not reserved to the states. See Thornton, supra, 514 U.S. at 802, 115 S.Ct. at 1854, 131 L.Ed.2d at 899-900 (holding that "the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the Constitution does not delegate to them [because n]o state can say, that it has reserved[] what it never possessed" (quoting 1 J. Story, Commentaries on the Constitution of the United States § 627 (3d ed. 1858))).
The issues before us do not concern merely the ministerial functioning of State officials under State law, or the State's choice to house federal prisoners. Rather, they involve the nature and scope of information that must be made available to the public concerning INS detainees. The power to regulate matters relating to immigration and naturalization resides exclusively in the federal government. The State simply has no constitutionally recognized role in this area. Thus, while the State possesses sovereign authority over the operation of its jails, it may not operate them, in respect of INS detainees, in any way that derogates the federal government's exclusive and expressed interest in regulating aliens.
Moreover, even if we were to view the matter as simply implicating questions of State autonomy concerning regulation of public records, the Tenth Amendment does not bar 8 C.F.R. § 236.6. In Reno v. Condon, 528 U.S. 141, 143-44, 120 S.Ct. 666, 668, 145 L.Ed.2d 587, 591 (2000), the United States Supreme Court upheld a federal statute that established a regulatory scheme to restrict the authority of the states to disclose personal information contained *655 in the records of state motor vehicle departments. The Court observed that the Tenth Amendment precludes the federal government from issuing directives requiring states to address particular problems or commanding state officers to administer or enforce federal regulatory programs. Id. at 149, 120 S.Ct. at 671, 145 L.Ed.2d at 594-95. A federal law cannot control or influence the manner in which states regulate private parties, but rather may only regulate the states themselves. Id. at 150, 120 S.Ct. at 672, 145 L.Ed.2d at 595. The Court held, however, that the statute at issue did "not require the States in their sovereign capacity to regulate their own citizens" but merely "regulate[d] the States as the owners of the data bases." Id. at 151, 120 S.Ct. at 672, 145 L.Ed.2d at 596. The statute did "not require the state legislatures to enact any laws or regulations," nor did it "require state officials to assist in the [administration] of federal statutes regulating private individuals." Ibid. Similarly, 8 C.F.R. § 236.6 does not require New Jersey to enact any legislation, nor does it require State officials to administer a federal regulatory scheme, or even to accept federal prisoners or detainees. N.J.S.A. 30:8-2 represents a choice made by the State of New Jersey, not one imposed by the federal government. Viewed in this light, 8 C.F.R. § 236.6 simply controls the type of information the State can release to the public in respect of a subject matter committed to the plenary authority of the federal government.
If federal regulations restricting the release of information compiled by state motor vehicle departments pass constitutional muster, then regulations restricting the release of information compiled by state correctional facilities about INS detainees certainly do as well. Indeed, while the states have traditionally administered and regulated the issuance of drivers licenses, they have never been empowered to regulate immigration and naturalization matters. Thus, plaintiffs' contentions that Tenth Amendment emanations invalidate the federal regulation are unavailing.

(4)
An additional, and different, yardstick would be available to measure the validity of 8 C.F.R. § 236.6 if federal law contained counterparts to the State statutory provisions at issue here. We are unaware of any such federal standards, however. Viewed solely as a contest between the applicability of our State statutes as interpreted and applied by the trial court, and the pre-emptive qualities of 8 C.F.R. § 236.6, the result required by the Supremacy Clause is clear.

VIII
We have concluded that it is of no consequence, as the issues come before us, whether the disclosure sought by plaintiffs is required as a matter of State law. To the extent the State laws involved may be viewed as requiring public disclosure of information regarding INS detainees, they would be in conflict with 8 C.F.R. § 236.6. Therefore, the federal regulation must be seen as pre-empting State law bearing upon its subject matter. Finally, we have concluded that none of the arguments advanced by plaintiffs to impugn the validity of 8 C.F.R. § 236.6 has merit.
Accordingly, the order and judgment entered in favor of plaintiffs must be reversed. The trial court's order permitting the United States to intervene as a party defendant is affirmed. The counties' cross-appeals from the order dismissing their third-party complaints are dismissed as moot.
NOTES
[*] The Right-to-Know Law has been amended effective July 7, 2002. It will be codified as N.J.S.A. 47:1A-1 to -13.